[No. B131655. Second Dist., Div. Three. Feb. 8, 2001.]

MARCIA SPIELHOLZ et al., Petitioners, v.
THE SUPERIOR COURT OF LOS ANGELES COUNTY, Respondent;
LOS ANGELES CELLULAR TELEPHONE COMPANY et al., Real
Parties in Interest.

## COUNSEL

Lieff, Cabraser, Heimann & Bernstein, Elizabeth J. Cabraser, Jacqueline E. Mottek, Michael W. Sobol, Stephen H. Cassidy, Fabrice N. Vincent; Milberg Weiss Bershad Hynes & Lerach, William S. Lerach, Leonard B. Simon, William Dato, Alan M. Mansfield, Reed R. Kathrein, Patrick W. Daniels; and Ronald F. Hoffman for Petitioners.

No appearance for Respondent.

Gibson, Dunn & Crutcher, Mark A. Perry, Steven E. Sletten and Christine Naylor for Real Parties in Interest.

## OPINION

**CROSKEY, J.**—Petitioners Marcia Spielholz, Debra Petcove, and Wireless Consumers' Alliance, Inc. (collectively, Spielholz), sued Los Angeles

Cellular Telephone Company and AT&T Wireless Services, Inc. (collectively, AT&T), alleging that AT&T falsely advertised a "seamless calling area" throughout Southern California and that it failed to disclose gaps or "dead zones" where wireless telephone users are unable to connect calls. AT&T moved to strike the allegations for monetary relief, based on title 47 United States Code[1] section 332(c)(3)(A), which provides that a state may not "regulate the entry of or the rates charged" by a wireless telephone service provider. It argued that for the court to award damages or restitution based on false advertising it must determine the value of the services provided, and that that determination would constitute rate regulation within the meaning of section 332(c)(3)(A) and therefore is expressly preempted. The trial court agreed and granted the motion.

Spielholz contends section 332(c)(3)(A) does not preempt a state court from awarding monetary relief based on false advertising. We agree.

### FACTUAL AND PROCEDURAL BACKGROUND

AT&T provides wireless telephone service to subscribers in the Los Angeles area. Marcia Spielholz and Debra Petcove are AT&T subscribers, and Wireless Consumers' Alliance, Inc., advocates on behalf of wireless telephone users.

Spielholz sued AT&T in February 1998 on behalf of herself and others similarly situated, alleging that it falsely advertised a "seamless calling area" of uninterrupted service throughout Southern California and failed to disclose the existence of gaps or "dead zones" within that area.[2] The second amended complaint filed in December 1998 alleges causes of action for unfair business practices, false advertising, violation of the Consumer Legal Remedies Act, intentional and negligent misrepresentation, breach of contract, and breach of the implied covenant of good faith and fair dealing.[3] Spielholz seeks injunctive and monetary relief, including damages and restitution.

AT&T moved to strike the allegations for monetary relief in January 1999. It argued that although the complaint alleges false advertising, the gravamen

---

[1] All statutory references are to title 47 of the United States Code unless otherwise specified.

[2] Marcia Spielholz previously had sued Los Angeles Cellular Telephone Company in another action. A published opinion in that action held that a limitation of liability provision in the defendant's tariff filed with the Public Utilities Commission was enforceable. (*Los Angeles Cellular Telephone Co. v. Superior Court* (1998) 65 Cal.App.4th 1013, 1017, 1019 [76 Cal.Rptr.2d 894].) The incident in that action occurred before the effective date of federal preemption of California's rate regulations (*id.* at p. 1017, fn. 3), and the issues addressed in that opinion are unrelated to the present issues.

[3] Since the tort causes of action all arise from the alleged fraudulent advertising, we refer to them collectively as false advertising.

of the complaint is that its rates are unreasonable, and the court would be required to determine the fair value of its services in order to award damages or restitution. Such a determination, it argued, would conflict with the federal statutory prohibition against state regulation of rates charged by wireless telephone service providers (§ 332(c)(3)(A)) and therefore is preempted. The court agreed and granted the motion in February 1999.

 ██ Spielholz petitioned this court for a writ of mandate, and we issued an alternative writ.[4] Wireless Consumers' Alliance, Inc., also petitioned the Federal Communications Commission (FCC) for a declaratory ruling on the preemption issue. We stayed the proceedings in this court pending resolution of the FCC petition. The FCC issued its opinion in August 2000, and we vacated the stay.

The FCC concluded that section 332(c)(3)(A) generally does not preempt an award of monetary relief by state courts based on state tort or contract claims, unless a court "purports to determine the reasonableness of a prior rate or it sets a prospective charge for services." (*In re Wireless Consumers Alliance, Inc.* (2000) 15 F.C.C.R. 17,021, ¶¶ 9, 38, 39.) Without purporting to rule on the specific allegations in this action, the FCC distinguished between "an outright determination of whether a price charged . . . was unreasonable," which would be preempted, and the determination of "whether . . . there was a difference between promise and performance" in the context of false advertising or breach of contract, which would not be preempted.[5] (*Id.* at ¶¶ 25-26.)

## CONTENTIONS

 Spielholz contends section 332(c)(3)(A) does not preempt a state court from awarding monetary relief based on false advertising.[6] AT&T contends an award of monetary relief would require the court to determine the reasonableness of the rates charged and therefore would constitute prohibited rate regulation within the meaning of section 332(c)(3)(A).

---

[4]Although extraordinary relief ordinarily is not available at the pleading stage, mandamus is available when a trial court erroneously prevents a party from pleading a substantial part of its case and when extraordinary relief may prevent a needless and expensive trial and reversal. (*Taylor v. Superior Court* (1979) 24 Cal.3d 890, 894 [157 Cal.Rptr. 693, 598 P.2d 854].)

[5]The FCC has rejected a motion for reconsideration of its opinion, and the opinion has been appealed to the District of Columbia Circuit Court of Appeals. In any event, the parties acknowledge that the FCC opinion does not purport to determine whether the specific allegations in this action are preempted and that the opinion may be persuasive but is not binding on this court.

[6]Spielholz challenges the trial court's order as to the tort causes of action only and states that she will dismiss the two contract causes of action.

## DISCUSSION

### 1. *Standard of Review*

■ We review the order striking the allegations for monetary relief de novo, consider the allegations of the complaint as a whole, and assume their truth to determine whether they plead ultimate facts that would support a monetary award. (*Clauson v. Superior Court* (1998) 67 Cal.App.4th 1253, 1255 [79 Cal.Rptr.2d 747].) ■ Specifically, our task is to determine whether section 332(c)(3)(A) preempts a state court award of monetary relief for causes of action based on false advertising.

■ Preemption is a legal issue involving statutory construction and the ascertainment of legislative intent, which we also review de novo. (*Service by Medallion, Inc. v. Clorox Co.* (1996) 44 Cal.App.4th 1807, 1812 [52 Cal.Rptr.2d 650].)

### 2. *Preemption*

■ Congress has the power to preempt state law under the supremacy clause of the United States Constitution (art. VI, cl. 2). (*Crosby v. National Foreign Trade Council* (2000) 530 U.S. 363, 372-374 [120 S.Ct. 2288, 2293-2294, 147 L.Ed.2d 352, 361].) Congress's intent to preempt may be expressly stated or implied where a federal law demonstrates an intent to " 'occupy the field' " or a state law conflicts with a federal law. (*Ibid.*) A conflict exists where compliance with both state and federal law is impossible, or where a state law " 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.' " (*Ibid.*, quoting *Hines v. Davidowitz* (1941) 312 U.S. 52, 67 [61 S.Ct. 399, 404, 85 L.Ed. 581]; *English v. General Electric Co.* (1990) 496 U.S. 72, 79 [110 S.Ct. 2270, 2275, 110 L.Ed.2d 65].)

To determine whether Congress intended to preempt state law with respect to a particular activity, we focus on the nature of the activity that the state seeks to control or regulate rather than on the method of regulation adopted. (*San Diego Unions v. Garmon* (1959) 359 U.S. 236, 243 [79 S.Ct. 773, 778-779, 3 L.Ed.2d 775].) Preemption therefore applies not only to positive enactments by legislation or regulation but also to judicial acts that interfere or conflict with congressional intent. (*Id.* at p. 247 [79 S.Ct. at pp. 780-781] [held that a damage award against labor unions was impliedly preempted as state regulation of union activity].)

Congress's intent to preempt must be "clear and manifest" to preempt state law in a field traditionally occupied by the states, such as the exercise

of a state's police powers. (*Medtronic, Inc. v. Lohr* (1996) 518 U.S. 470, 485 [116 S.Ct. 2240, 2250, 135 L.Ed.2d 700]; *California v. ARC America Corp.* (1988) 490 U.S. 93, 101 [109 S.Ct. 1661, 1665, 104 L.Ed.2d 86].) This creates a presumption against preemption. (*Medtronic*, at p. 485 [116 S.Ct. at p. 2250]; *ARC America Corp.*, at p. 101 [109 S.Ct. at p. 1665].) The states' police powers extend to consumer protection, such as claims based on false advertising, so the presumption against preemption applies in the present action. (*ARC America Corp.*, at p. 101 [109 S.Ct. at p. 1665]; *Smiley v. Citibank* (1995) 11 Cal.4th 138, 148 [44 Cal.Rptr.2d 441, 900 P.2d 690], affd. (1996) 517 U.S. 735 [116 S.Ct. 1730, 135 L.Ed.2d 25].)

### 3. *Section 332(c)(3)(A)*

■ Section 332(c)(3)(A) is part of the 1993 amendments to the Communications Act of 1934 (§ 151 et seq.). (Omnibus Budget Reconciliation Act of 1993, Pub.L. No. 103-66, § 6002(b)(2)(A) (Aug. 10, 1993), 107 Stat. 312, 393 (Communications Act).) Under the Communications Act, common carriers engaged in interstate or foreign wire or radio communication must file with the FCC a schedule or "tariff" showing all charges and the classifications, practices, and regulations affecting those charges. (§ 203(a).) The contents of the tariff are subject to FCC approval, and the FCC may determine and prescribe just and reasonable charges, classifications, practices, and regulations. (§§ 204(a), 205(a).)

The 1993 amendments authorized the FCC to exempt wireless telephone service from the tariff filing requirement and the provision allowing the FCC to prescribe just and reasonable charges, classifications, practices, and regulations, provided that the FCC determined that those provisions were not necessary to ensure just and reasonable charges, classifications, practices, and regulations. (Pub.L. No. 103-66, § 6002(b)(2)(A) (Aug. 10, 1993) 107 Stat. at 312, 393, codified at § 332(c)(1)(A).) The FCC so determined and ordered the exemption in 1994. (*In the Matter of Implementation of Sections 3(n) and 332 of the Communications Act Regulatory Treatment of Mobile Services* (1994) 9 F.C.C.R. 1411; see 47 C.F.R. § 20.15(c) (1999).)

Section 332(c)(3)(A) states that no state or local government may "regulate . . . the rates charged" by a wireless telephone service provider, but that a state may "regulat[e] the other terms and conditions" of service.[7] It further provides that a state may petition the FCC for authority to "regulate the

---

[7]Section 332(c)(3) states in relevant part: "(A) Notwithstanding sections 152(b) and 221(b) of this title, no State or local government shall have any authority to *regulate the entry of or the rates charged* by any commercial mobile service or any private mobile service, except that this paragraph shall not prohibit a State from *regulating the other terms and conditions of*

rates" for service, and that the FCC shall grant the petition if market conditions do not adequately ensure just and reasonable rates. Section 332 (c)(3)(B) provides that a state may petition the FCC for authority to continue any existing "regulation concerning the rates" for service, which the FCC must review under the same standard.[8]

The Communications Act also contains a saving clause that predates the 1993 amendments, stating "Nothing in this chapter contained shall in any way abridge or alter the remedies now existing at common law or by statute, but the provisions of this chapter are in addition to such remedies." (§ 414.)

### 4. *Express Preemption*

The question of whether section 332(c)(3)(A) expressly preempts an award of monetary relief in this action turns on the question of whether such an award would constitute rate regulation within the meaning of section 332(c)(3)(A) intended by Congress.

Rate regulation, or to "regulate . . . the rates charged" in the words of section 332(c)(3)(A), refers, in our view, to an action whose principal purpose and direct effect are to control prices. The term ordinarily refers to direct price controls of the sort that the 1993 amendments authorized the FCC to terminate for wireless telephone service providers by exempting them. In the context of amendments that allow the FCC to exempt providers

commercial mobile services. . . . Notwithstanding the first sentence of this subparagraph, a State may petition the Commission for authority to regulate the rates for any commercial mobile service and the Commission shall grant such petition if such State demonstrates that—[¶] (i) market conditions with respect to such services fail to protect subscribers adequately from unjust and unreasonable rates or rates that are unjustly or unreasonably discriminatory; or [¶] (ii) such market conditions exist and such service is a replacement for land line telephone exchange service for a substantial portion of the telephone land line exchange service within such State. The Commission shall provide reasonable opportunity for public comment in response to such petition, and shall, within 9 months after the date of its submission, grant or deny such petition. If the Commission grants such petition, the Commission shall authorize the State to exercise under State law such authority over rates, for such periods of time, as the Commission deems necessary to ensure that such rates are just and reasonable and not unjustly or unreasonably discriminatory.

"(B) If a State has in effect on June 1, 1993, any *regulation concerning the rates* for any commercial mobile service offered in such State on such date, such State may, no later than 1 year after August 10, 1993, petition the Commission requesting that the State be authorized to continue exercising authority over such rates. . . ." (Italics added.)

The statutory definition of "commercial mobile service" includes wireless telephone service providers. (See § 332(d)(1) & (2).)

[8]California petitioned the FCC in 1994 to continue the state's existing rate regulations. The FCC denied the petition in 1995. (*In the Matter of Petition of the People of the State of California and the Public Utilities Commission of the State of California to Retain Regulatory Authority over Intrastate Cellular Service Rates* (1995) 10 F.C.C.R. 7486.)

from its authority to "determine and prescribe" (§ 205(a)) just and reasonable charges, we construe "regulate . . . the rates charged" (§ 332(c)(3(A)) to refer to the same sort of direct price controls. Thus, section 332(c)(3)(A) allows the FCC to discontinue its direct price controls and prohibits the states from imposing their own. This meaning is "clear and manifest" (*Medtronic, Inc. v. Lohr, supra,* 518 U.S. at p. 484 [116 S.Ct. at pp. 2249-2250]; *California v. ARC America Corp., supra,* 490 U.S. at p. 101 [109 S.Ct. at p. 1665]); the meaning advocated by AT&T is not.[9]

Section 332(c)(3)(A) does not disclose a congressional intent to preempt state court monetary awards that may require a determination of the value of services provided but do not *directly* regulate rates. We presume that if Congress had intended to preempt such state law remedies, it would have expressly so stated. Not only does the Communications Act not so state, but it states that it generally does not preclude state law remedies. (§ 414.) Courts have held that the saving clause preserves state law remedies for breaches of duties that are distinguishable from duties created under the act (*Kellerman v. MCI Telecommunications Corp.* (1986) 112 Ill.2d 428 [98 Ill.Dec. 24, 493 N.E.2d 1045, 1051] [false advertising]; *Cooperative Communications, Inc. v. AT & T Corp.* (D.Utah 1994) 867 F.Supp. 1511, 1516 [unfair competition]; see *American Telephone & Telegraph Co. v. Central Office Telephone, Inc.* (1998) 524 U.S. 214, 227 [118 S.Ct. 1956, 1965, 141 L.Ed.2d 222] (*Central Office Telephone*) [the saving clause preserves only those rights that are not inconsistent with federal statutory requirements]), and we agree.

A judicial act constitutes rate regulation only if its principal purpose and direct effect are to control rates. For example, an injunction that prevents a wireless telephone service provider from charging specified rates would directly regulate rates. (*Ball v. GTE Mobilnet of California* (2000) 81 Cal.App.4th 529, 537-538 [96 Cal.Rptr.2d 801]; accord, *In re Comcast Cellular Telecom. Litigation* (E.D.Pa. 1996) 949 F.Supp. 1193, 1201.) Similarly, if a cause of action directly challenges a rate as unreasonable, an award of damages or restitution to compensate a customer for the difference between the rate paid and what the court determines to be a reasonable rate would directly regulate rates. (*Ball,* at pp. 537-538; accord, *Comcast,* at p. 1201.) In general, a claim that directly challenges a rate and seeks a remedy

---

[9]We find no ambiguity in the language "regulate . . . the rates" (§ 332(c)(3)(A)) in the context presented here, so it is neither necessary nor appropriate to consider the legislative history concerning "other terms and conditions" (*ibid.*) that some courts have cited in support of their conclusion that the statute does not preempt state laws concerning false advertising and billing practices. (See, e.g., *Tenore v. AT & T Wireless Services, Inc.* (1998) 136 Wash.2d 322 [962 P.2d 104, 111]; *DeCastro v. AWACS, Inc.* (D.N.J. 1996) 935 F.Supp. 541, 552.)

to limit or control the rate prospectively or retrospectively is an attempt to regulate rates and therefore is preempted under section 332(c)(3)(A); a claim that directly challenges some other activity, such as false advertising, and requires a determination of the value of services provided in order to award monetary relief is not rate regulation.

*Ball v. GTE Mobilnet of California, supra,* 81 Cal.App.4th 529, *In re Comcast Cellular Telecom. Litigation, supra,* 949 F.Supp. 1193, and *Tenore v. AT & T Wireless Services, Inc., supra,* 962 P.2d 104 all involved the practice of billing in full minute increments, or rounding up to the next full minute, and other practices that resulted in charges for noncommunication time. The courts concluded that section 332(c)(3)(A) preempts claims that directly challenge the rate charged by a wireless telephone service provider (*Ball,* at pp. 537-538; *Comcast,* at p. 1201), but does not preempt claims alleging the failure to disclose a practice that affects the total amount charged (*Ball,* at p. 543; *Comcast,* at p. 1200; *Tenore,* at p. 115). They considered the billing increment to be an integral part of the rate and therefore held that direct challenges to the reasonableness or legality of the billing increment were preempted, but claims based on the failure to disclose the billing increment were not preempted. (*Ball,* at pp. 537-538, 543;[10] *Comcast,* at pp. 1200, 1201; *Tenore,* at p. 115.)

We agree in principle with the distinction drawn in those cases between claims that directly challenge the rate charged and claims that challenge some other practice, such as false advertising. A monetary award based on the latter type of claim would affect the rate charged only incidentally and is not a direct price control or rate regulation. (See *Nader v. Allegheny Airlines* (1976) 426 U.S. 290, 299-300 [96 S.Ct. 1978, 1984-1985, 48 L.Ed.2d 643], discussed *post.*)

Based on the foregoing, we conclude that a claim that does not directly challenge the rate but directly challenges some other activity, such as false advertising, and seeks a remedy to limit or control that activity or seeks damages arising from the activity is not an attempt to regulate rates and is not expressly preempted under section 332(c)(3)(A). If the principal purpose and direct effect of a remedy are to prevent false advertising and compensate an aggrieved customer, any prospective or retrospective effect on rates is merely incidental. This is true even if the court determines the value of

---

[10]The *Ball* court, in dictum, expressed apprehension as to whether the trial court could award monetary relief based on nondisclosure or could only order an injunction. (*Ball v. GTE Mobilnet of California, supra,* 81 Cal.App.4th at p. 543.) It cited several cases (*ibid.*), but did not explain the reasons for its apprehension. Having reviewed those cases, we do not share the court's apprehension and perceive no obstacle to a monetary award in this action.

services provided in awarding damages or restitution. (Accord, *Tenore v. AT & T Wireless Services, Inc., supra*, 962 P.2d at pp. 112, 115.) Contrary to AT&T's argument, an award of damages or restitution for false advertising that requires the court to determine the value of services provided is not rate regulation. (*Ibid.*)

### 5. *Implied Preemption*

The existence of an express preemption provision and a saving clause does not necessarily negate the possibility of implied preemption (*Geier v. American Honda Motor Co.* (2000) 529 U.S. 861, 870-873 [120 S.Ct. 1913, 1920-1921, 146 L.Ed.2d 914, 925-926]), although they clearly weigh against implied preemption here.[11] The Communications Act does not evidence an intent to preempt monetary relief for state law causes of action based on false advertising.

The Communications Act does not address the issue of gaps or dead zones within a calling area, and there is no requirement that a calling area include gaps or dead zones or that the service provider fail to disclose their existence. Monetary relief under state law causes of action arising from the misrepresentation and nondisclosure of those conditions therefore would not conflict with any federal requirements. (See *Nader v. Allegheny Airlines, supra*, 426 U.S. at pp. 299-300, 304 [96 S.Ct. at pp. 1984-1985, 1987].)

The Communications Act also does not evidence an intent to "occupy the field" of either calling area continuity or false advertising. Although the act requires that charges, classifications, practices, and regulations be just and reasonable (§ 201(b)) and provides a right of action before the FCC or in federal court for violation of those requirements (§ 207), those provisions do not evidence an intent to preclude all other remedies within the broad ambit of a service provider's practices. A potential federal remedy is not necessarily inconsistent with state remedies, as acknowledged by the saving clause. We perceive no conflict.

Moreover, the availability of state law remedies is consistent with the 1993 amendments' objective to achieve maximum benefits for consumers

---

[11]The Supreme Court in *Cipollone v. Liggett Group, Inc.* (1992) 505 U.S. 504, 517 [112 S.Ct. 2608, 2618, 120 L.Ed.2d 407], seemed to suggest that an express preemption clause forecloses any inquiry into implied preemption. It later clarified the holding, stating that it supported "[a]t best . . . an inference that an express pre-emption clause forecloses implied pre-emption; it does not establish a rule." (*Freightliner Corp. v. Myrick* (1995) 514 U.S. 280, 288-289 [115 S.Ct. 1483, 1488, 131 L.Ed.2d 385].) Its recent opinion in *Geier v. American Honda Motor Co., supra*, 529 U.S. at pages 870-872 [120 S.Ct. at page 1920, 146 L.Ed.2d at pages 925-926], however, affirmatively states that an express preemption provision does not preclude implied preemption.

and providers through reliance on the competitive marketplace, in which state law duties and remedies ordinarily are enforceable. (See *In re Wireless Consumers Alliance, Inc., supra,* 15 F.C.C.R. 17,021, ¶¶ 22, 24.)

### 6. *The Filed Rate Doctrine*

AT&T contends we should construe the preemptive effect of section 332(c)(3)(A) by reference to the common law filed rate doctrine, as it has urged in similar cases in other jurisdictions, cited *post.* We reject this argument.

#### a. *The Doctrine and Its Purposes*

■ The filed rate doctrine applies to companies that are required to file a tariff with a federal agency where the agency has the authority to determine whether the rates are just and reasonable. (*Arkansas Louisiana Gas Co. v. Hall* (1981) 453 U.S. 571, 577 [101 S.Ct. 2925, 2930, 69 L.Ed.2d 856]; *Marcus v. AT&T Corp.* (2d Cir. 1998) 138 F.3d 46, 58.) The doctrine holds that the only lawful rate is the filed rate and that only the agency can determine the reasonableness of rates. (*Arkansas Louisiana Gas Co. v. Hall, supra,* 453 U.S. at p. 577 [101 S.Ct. at p. 2930]; *Montana-Dakota Utilities Co. v. Northwestern Public Service Co.* (1951) 341 U.S. 246, 251-252 [71 S.Ct. 692, 695-696, 95 L.Ed. 912].) The rates stated in the filed tariff are conclusive and cannot be invalidated or altered by judicial action. (*Arkansas Louisiana Gas Co.,* at pp. 578-579, 581-582 [101 S.Ct. at pp. 2930-2931, 2932-2933].) The purposes of the filed rate doctrine are to preserve the agency's primary jurisdiction to determine the reasonableness of rates and to ensure rate uniformity and nondiscrimination among customers. (*Arkansas Louisiana Gas Co.,* at pp. 577-578 [101 S.Ct. at pp. 2930-2931]; *Wegoland Ltd. v. NYNEX Corp.* (2d Cir. 1994) 27 F.3d 17, 19.)

■ Some courts have interpreted the filed rate doctrine to preempt not only claims that directly challenge the rates charged by regulated companies, but also claims that would require a court to determine the value of services provided in connection with a monetary award or would result in a rebate to selected customers. (See, e.g., *Day v. AT & T Corp.* (1998) 63 Cal.App.4th 325, 339-340 [74 Cal.Rptr.2d 55] [unfair business practices and false advertising]; *Marcus v. AT&T Corp., supra,* 138 F.3d at pp. 60-62 [fraud].) AT&T cites these and similar cases and argues by analogy that they support a broad interpretation of the preemptive effect of section 332(c)(3)(A). We disagree. The purposes served by the filed rate doctrine, to preserve the FCC's role in the ratemaking process and to ensure rate uniformity, would serve no purpose in an industry with no uniform, filed rates approved by the FCC.

(Accord, *Tenore v. AT & T Wireless Services, Inc., supra,* 962 P.2d at p. 110; *In re Wireless Consumers Alliance, Inc., supra,* 15 F.C.C.R. 17,021, ¶¶ 19-22.[12]) Cases applying the filed rate doctrine therefore are distinguishable and inapplicable.

We now proceed to distinguish two cases applying the filed rate doctrine on which AT&T relies and discuss a third case that helps to illustrate our point.

### b. *AT&T v. Central Office Telephone*

*Central Office Telephone, supra,* 524 U.S. 214, involved tort and contract claims related to AT&T's long-distance telephone service, which is subject to the tariff filing requirement. (§§ 153(h), 203(a); *Central Office Telephone,* at p. 221 [118 S.Ct. at p. 1962].) The high court noted that in addition to showing the charges, a filed tariff also must show the classifications, practices, and regulations affecting those charges (§ 203(a)), and that it is unlawful to extend any "privileges or facilities in such communication, or employ or enforce any classifications, regulations, or practices affecting such charges" except as specified in the tariff (§ 203(c)). (*Central Office Telephone,* at pp. 223-224 [118 S.Ct. at pp. 1963-1964].)

The court noted the purpose of the filed rate doctrine to ensure uniform, nondiscriminatory rates, stated that a discriminatory rate or privilege can take the form of a lower price for the same service or an enhanced service for the same price, and stated that rates "have meaning only when one knows the services to which they are attached." (*Central Office Telephone, supra,* 524 U.S. at p. 215 [118 S.Ct. at p. 1959].) In this context, it stated further that "Any claim for excessive rates can be couched as a claim for inadequate services and vice versa." (*Id.* at p. 223 [118 S.Ct. at p. 1963].)

The plaintiff, a reseller of long-distance telephone service, claimed that it was entitled to services and provisions other than those stated in the filed tariff, based on certain promises. (*Central Office Telephone, supra,* 524 U.S. at p. 220 [118 S.Ct. at pp. 1961-1962].) The court concluded that the

---

[12]In rejecting AT&T's argument, the FCC stated, "It appears that CMRS [commercial mobile radio service] providers have engendered much confusion over the issue of the applicability of the filed rate doctrine in cases concerning the preemptive effect of Section 332. For example, CMRS providers regularly cite filed rate cases to support their position, often without any acknowledgement that Section 332 cases do not involve filed rates. While some may admit that the filed rate doctrine does not apply, they urge that the same analysis be used in Section 332 cases without clarifying that Section 332 cases arise under a totally different regulatory regime." (*In re Wireless Consumers Alliance, Inc., supra,* 15 F.C.C.R. 17,021, ¶ 15, fn. 47.)

additional services and provisions all pertained to matters that were *"specifically addressed* by the filed tariff" and were contrary to those terms, and that since the claims sought unlawful privileges contrary to the filed tariff they were preempted. (*Id.* at pp. 224-226 [118 S.Ct. at pp. 1963-1965]).

Thus, the court held that the filed rate doctrine bars a claim alleging entitlement to services on terms *contrary to the terms specified in the filed tariff.* It did not hold that any claim alleging inadequate services necessarily attacks the reasonableness of rates and therefore is preempted regardless of whether the plaintiff seeks to impose service terms contrary to those specified in a filed tariff, as some courts have interpreted the opinion. (See, e.g., *Bastien v. AT&T Wireless Services, Inc.* (7th Cir. 2000) 205 F.3d 983, 988 (*Bastien*); *Bryceland v. AT & T Corp.* (N.D.Tex. 2000) 122 F.Supp.2d 703, 709; *Naevus Intern., Inc. v. AT & T Corp.* (2000) 185 Misc.2d 655 [713 N.Y.S.2d 642, 645].) Nor did it hold or suggest that a claim that a provider misrepresented or concealed its service quality is actually a challenge to the reasonableness of rates and therefore is an attempt to regulate rates within the meaning of section 332(c)(3)(A), as AT&T now argues.

c. *Bastien v. AT&T Wireless Services, Inc.*

The Seventh Circuit Court of Appeals in *Bastien, supra,* 205 F.3d 983, 989-990, held that section 332(c)(3)(A) completely preempted the plaintiff's fraud and contract claims, for purposes of federal removal jurisdiction. It construed allegations that AT&T's infrastructure was inadequate to ensure quality service as a challenge to AT&T's right to enter the market on the terms approved by the FCC, including terms specifying coverage area and antenna power requirements. (*Bastien,* at pp. 988, 989-990, citing 47 C.F.R. §§ 24.103, 24.132, 24.232 (2000).) It held that section 332(c)(3)(A), stating that a state cannot "regulate the entry of or the rates charged" by a communications common carrier, expressly preempted such a challenge to the right of entry. (*Bastien,* at p. 989.) It further held that the generality of the plaintiff's misrepresentation and fraud allegations revealed that those claims were simply an attempt to recast the same challenge to AT&T's right of entry as state law claims, and therefore concluded that the misrepresentation and concealment claims were preempted as well. (*Id.* at pp. 989-990.)

The *Bastien* court also relied in part on the filed rate doctrine. It stated that the FCC had approved AT&T's rates for wireless telephone service (*Bastien, supra,* 205 F.3d at p. 984) and that the plaintiff's claims necessarily challenged the FCC's decision as to the reasonableness of the approved rates and therefore were preempted (*Id.* at p. 999). It regarded a challenge to service quality as an attack on the reasonableness of the approved rates, stating "As

the Supreme Court recognized in *Central Office Telephone*, a complaint that service quality is poor is really an attack on the rates charged for the service and may be treated as a federal case regardless of whether the issue was framed in terms of state law." (*Bastien*, at p. 988, citing *Central Office Telephone, supra*, 524 U.S. at p. 223 [118 S.Ct. at p. 1963]; see *Naevus Intern., Inc. v. AT & T Corp., supra*, 713 N.Y.S.2d at p. 645, following *Bastien*.)

We disagree with the *Bastien* court's expansive interpretation of language from *Central Office Telephone* and do not believe that a challenge to service quality necessarily attacks the reasonableness of rates approved by the FCC, as discussed *ante*. Moreover, *Bastien* is distinguishable in that the court's holding was based on its conclusion that the FCC had approved AT&T's filed tariff for wireless telephone service; here it is undisputed that wireless telephone service providers in California are exempt from the tariff filing requirement. Since there is no tariff filing requirement, the filed rate doctrine is inapplicable.

We also reject AT&T's argument that Spielholz's allegations of misrepresentation and nondisclosure concerning undisclosed gaps and "dead zones" should be construed as a challenge to the adequacy of its infrastructure, and that such a challenge conflicts with and undermines FCC requirements and therefore is preempted, as in *Bastien*. We construe the complaint liberally in connection with an attack on the pleading. (Code Civ. Proc., § 452.) The complaint adequately alleges several tort causes of action based on false advertising, and the allegations that AT&T's infrastructure is inadequate only support those causes of action; they do not defeat them.

### d. *Nader v. Allegheny Airlines*

In *Nader v. Allegheny Airlines, supra*, 426 U.S. 290, the plaintiff challenged the defendant's fraudulent misrepresentation of its practice of overbooking flights, which resulted in "bumping" passengers from their reserved seats. (*Id.* at pp. 295, 296 [96 S.Ct. at pp. 1982-1983].) The Federal Aviation Act authorized the Civil Aeronautics Board to determine whether an air carrier had engaged in " 'unfair or deceptive practices,' " but a saving clause expressly preserved other statutory and common law remedies. (*Id.* at pp. 296, fn. 7, 298 [96 S.Ct. at pp. 1983, 1984].) The high court concluded that the statutory scheme did not irreconcilably conflict with or preempt a state common law fraud action. (*Id.* at pp. 299-300 [96 S.Ct. at pp. 1984-1985].)

The court stated that the plaintiff's claim did not directly challenge the agency's ratemaking power and that any impact on rates resulting from the

imposition of tort liability "would be merely incidental." (*Nader v. Allegheny Airlines, supra,* 426 U.S. at pp. 299-300 [96 S.Ct. at pp. 1984-1985].) It noted that the plaintiff did not challenge the reasonableness of an agency requirement or practice included within the filed tariff, since there was no agency or tariff requirement that air carriers overbook flights or that they fail to disclose the practice, and therefore concluded that the filed rate doctrine did not apply. (*Id.* at pp. 299-300, 304 [96 S.Ct. at pp. 1984-1985, 1987].)

Similarly here, the Communications Act does not address the issue of gaps or dead zones within a calling area, and there is no FCC requirement that a calling area include gaps or dead zones or that the service provider fail to disclose their existence. Spielholz's claims do not challenge the reasonableness of an FCC requirement or practice included within a filed tariff, particularly since there is no filed tariff for wireless telephone service providers, and monetary relief would pose no irreconcilable conflict with federal law.

### DISPOSITION

Let a peremptory writ of mandate issue directing the superior court to vacate its order granting AT&T's motion to strike and issue a new order denying the motion. The alternative writ of mandate issued on June 8, 2000, is discharged. Petitioners shall recover their costs in this proceeding.

Klein, P. J., and Kitching, J., concurred.

The petition of real parties in interest for review by the Supreme Court was denied May 23, 2001. Werdegar, J., did not participate therein. Kennard, J., was of the opinion that the petition should be granted.