[No. G027973. Fourth Dist., Div. Three. June 27, 2002.]

CONSUMER JUSTICE CENTER, Plaintiff and Appellant, v. OLYMPIAN LABS, INC., et al., Defendants and Respondents.

**COUNSEL**

Mark Boling for Plaintiff and Appellant.

Bill Lockyer, Attorney General, Richard M. Frank and Herschel T. Elkins, Assistant Attorneys General, Ronald Reiter and Ian K. Sweedler, Deputy

Attorneys General, for the People as Amicus Curiae on behalf of Plaintiff and Appellant.

Ropers, Majeski, Kohn & Bentley, Mark G. Bonino, Allan E. Anderson and Rachael A. Campbell for Defendants and Respondents.

## OPINION

## SILLS, P. J.—

### I. *Introduction*

Consumer Justice Center, a nonprofit entity, has filed a complaint under the California's unfair competition law (Bus. & Prof. Code, § 17200 et seq.) against the makers and distributors of two over-the-counter dietary supplements. Consumer Justice seeks injunctions to remove the products from the market altogether, alternatively to change the advertising of the products, and to have all the profits made from the products disgorged.

One of the supplements is "Medi-Phen," which is a combination of green tea extract, garcinia cambogia, ginger, mustard seed, cayenne, astragalus, white willow bark, uva ursi, siberian ginseng, and gotu kola. Allegedly, Medi-Phen has been advertised as a "natural alternative for weight loss." The other supplement is "Herp-Eeze," which is made from the chaparral bush. Allegedly, Herp-Eeze has been advertised for "the relief of Herpes simplex viruses." According to the complaint, neither product is safe, or effective for its advertised purpose.

The trial court ruled that federal law preempted the lawsuit, and so sustained a demurrer to the complaint without leave to amend. This appeal is limited to that single issue. We conclude that federal law does not preempt the lawsuit.

### II. *Express Preemption*

At the outset, we must note that there is no express preemption of cases involving the false advertising of dietary supplements in federal law under the Federal Trade Commission Act, the federal Food, Drug, and Cosmetic Act, or the Dietary Supplement Health and Education Act.[1] The defendants do not cite a single federal statute or regulation which says, in words or substance, that the field of allegedly false advertising of dietary supplements is exclusively the province of federal law.

---

[1] For readers addicted to acronyms, the three acts are, respectively, often referred to as the FTCA (15 U.S.C. § 41 et seq.), the FDCA (21 U.S.C. § 301 et seq.) and DSHEA, which

In fact, one pro-supplement commentator has lamented the absence of an express preemption provision for dietary supplements as regards the Dietary Supplement Heath and Education Act. (See Note, *Dietary Supplements and Their Discontents: FDA Regulation and the Dietary Supplement Health and Education Act of 1994* (2000) 31 Rutgers L. J. 511, 549 ["The DSHEA should be amended to explicitly establish that it preempts state regulation of dietary supplements. The advances brought about by the DSHEA could be adversely affected by intrusive state regulation of dietary supplements, and some states have already enacted legislation concerning dietary supplements such as ephedra and GHB."].)

It bears remarking at this point that Congress knows how to write a preemption clause if it wanted to. One of the most famous is found in the federal retirement and pension laws (ERISA).[2] (See 29 U.S.C. § 1144(a) ["the provisions of this subchapter and subchapter III of this chapter shall supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan"].) Because courts should not find federal preemption unless the purpose of Congress to preempt was " 'clear and manifest' " (*Medtronic v. Lohr* (1996) 518 U.S. 470, 485 [116 S.Ct. 2240, 2250, 135 L.Ed.2d 700]; *Greater N.Y. Metropolitan Food Council v. Giuliani* (2d Cir. 1999) 195 F.3d 100, 105), we go into the balance of our analysis, as do federal courts, with a presumption against preemption. (See *New York State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.* (1995) 514 U.S. 645, 654 [115 S.Ct. 1671, 1676, 131 L.Ed.2d 695]; *Greater N.Y. Metropolitan Food Council v. Giuliani, supra,* 195 F.3d at p. 105.)

### III. *Implied Preemption Under the Federal Trade Commission Act*

■ Rather, the case for preemption argument is based on "implied" preemption. Implied preemption is subdivided into two subtopics: either (a) an intent to occupy a given field, or (b) the impossibility of relief in the state court without a conflict with federal law. (*Spielholz v. Superior Court* (2001) 86 Cal.App.4th 1366, 1371 [104 Cal.Rptr.2d 197].)[3]

### A. *Occupation of the Field*

■ It is true that the Federal Trade Commission has the power to obtain injunctive relief regulating the advertising of dietary supplements.

amended the FDCA in 1994. (See Pub.L. No. 103-417 (Oct. 25, 1994) 108 Stat. 4325.) California's own unfair competition law, Business and Professions Code section 17200 et seq., is sometimes called the UCL (unfair competition law).

[2]Which stands for the Employee Retirement Income Security Act of 1974.

[3]*Speilholz* held that there was no preemption where a plaintiff sought to recover monetary relief against a cell phone company under state false advertising laws.

(E.g., *F.T.C. v. Pharmtech Research, Inc.* (D.D.C. 1983) 576 F.Supp. 294 [order that producer of "Daily Greens," a tablet of several vitamins, selenium, beta carotene and dehydrated vegetables, could not claim that the product reduced risk of cancer[4]].)

But it is also clear (indeed, as stressed by defendants here) that there is no private right of action under the Federal Trade Commission Act. In *Kraus v. Trinity Management Services, Inc.* (2000) 23 Cal.4th 116, 132 [96 Cal.Rptr.2d 485, 999 P.2d 718], our Supreme Court specifically noted that, while the Federal Trade Commission Act and California's unfair competition law both prohibit a wide range of unfair practices,[5] the federal law "has no private enforcement provision comparable" to California's.

The obvious conclusion to be drawn from the absence of a private cause of action is that Congress did not intend the Federal Trade Commission to "occupy the field" of redressing false advertising claims. As ERISA illustrates again, there is no doubt that when Congress really does choose to occupy a field it knows how to provide for a private federal cause of action. (E.g., 29 U.S.C. § 1132(a) [providing for civil actions to be brought by participants in ERISA plans].)

Moreover, a theme of the federal cases construing the Federal Trade Commission's analogous powers under the Lanham Act (involving false advertising in the context of trademarks) has been that the federal courts should not be swamped with consumer claims. (See *Colligan v. Activities Club of New York, Ltd.* (2d Cir. 1971) 442 F.2d 686, 693 [consumer standing would lead to "a veritable flood of claims" in federal courts]; see also authorities collected at Note, *Letting Consumers Stand On Their Own: An Argument for Congressional Action Regarding Consumer Standing for False Advertising Under Lanham Act Section 43(a), supra,* 24 Sw. U. L.Rev. at p. 214, fn. 3. [compiling cases that have refused consumers access to federal courts under false advertising prong of Lanham Act].)

The theory is that such claims can be adequately handled by state courts. (See *Colligan v. Activities Club of New York, Ltd., supra,* 442 F.2d at p. 693

---

[4]Congress would later have other ideas about the effects of such nutrients on the risk of cancer. In passing the Dietary Supplement Health and Education Act of 1994, Congress specifically found " 'there is a link between the ingestion of certain nutrients or dietary supplements and the prevention of chronic diseases such as cancer.' " (21 U.S.C.A. § 321, Historical and Statutory Notes (West 1999 ed.) foll. § 321, p. 169.)

[5]In fact, California's unfair competition law is sometimes referred to as a "baby FTC" act. (See Note, *Letting Consumers Stand on Their Own: An Argument for Congressional Action Regarding Consumer Standing for False Advertising Under Lanham Act Section 43(a)* (1994) 24 Sw. U. L.Rev. 213, 234, fn. 113.)

["adequate private remedies for consumer protection, which to date have been left almost exclusively to the States, are readily at hand"].)

■ The usual formula is that preemption applies "where the scheme of federal regulation is sufficiently comprehensive to make reasonable the inference that Congress 'left no room' for supplementary state regulation." (*Hillsborough County v. Automated Medical Labs* (1985) 471 U.S. 707, 713 [105 S.Ct. 2371, 2375, 85 L.Ed.2d 714].) ■ Here, however, the absence of a private cause of action means that Congress has obviously left plenty of room for the states to "supplement" the Federal Trade Act by providing for private causes of action. (See *Cipollone v. Liggett Group, Inc.* (1992) 505 U.S. 504, 516 [112 S.Ct. 2608, 2617, 120 L.Ed.2d 407], quoting *Fidelity Federal Sav. & Loan Assn. v. De la Cuesta* (1982) 458 U.S. 141, 153 [102 S.Ct. 3014, 3022, 73 L.Ed.2d 664], quoting *Rice v. Santa Fe Elevator Corp.* (1947) 331 U.S. 218, 230 [67 S.Ct. 1146, 1152, 91 L.Ed. 1447].) One can hardly "occupy a field" while shunning vast acres of it.[6]

### B. *Conflict*

The question of conflict preemption is just a little trickier. On the one hand, there is a provision in the Federal Trade Commission Act that makes it clear the Act *doesn't* preempt state law. Title 15 United States Code section 57b(e) provides: "Remedies provided in this section are *in addition to*, and not in lieu of, *any other remedy* or right of action *provided by State* or Federal *law*." (Italics added.)

One would think the provision would be enough, but the defendants posit that even such a blanket "savings" clause as 15 United States Code section 57b(e) does not mean there is no preemption if there is actual conflict. (See, e.g., *Geier v. American Honda Motor Co., Inc.* (2000) 529 U.S. 861 [120 S.Ct. 1913, 146 L.Ed.2d 914].) In *Geier*, the federal Supreme Court concluded there was a conflict between a state tort action for failing to equip a car with a driver's side airbag. To allow the suit would defeat the purpose of federal regulations which were specifically intended to permit several different kinds of safety measures *without* requiring airbags. (See *Geier, supra,* 529 U.S. at p. 881 [120 S.Ct. at p. 1925].)

The problem is tricky because the Federal Trade Commission Act certainly does give the commission the power to prevent persons "from using

---

[6]Exactly how "comprehensive" must the regulatory scheme be before it does imply preemption? The *Hillsborough* case suggests that the federal scheme must be very comprehensive indeed—as distinct from merely run-of-the-mill comprehensive. There the high court concluded there was no preemption in the area of blood plasma regulation, even though it characterized the existing federal regulations as "comprehensive."

. . . unfair or deceptive acts or practices in or affecting commerce." (15 U.S.C. § 45(a)(2).) Theoretically at least, the commission might seek to enforce a uniform label (or disclaimer) on dietary supplements claiming to aid weight loss (or alleviate herpes infections, or whatever), and those uniform labeling requirements might conflict with injunctive relief granted by a California trial court in the case before us.[7]

■ However, the rule is that for "conflict" preemption to exist, it must be *impossible* to comply with both the federal and state laws. (E.g., *Spielholz v. Superior Court, supra,* 86 Cal.App.4th at p. 1371.) Accordingly, preemption cannot be based on a belief in phantoms, i.e., speculation. ■ Since the Federal Trade Commission has *not now* made any regulations (or taken any action with which the present litigation might conflict) there is no conflict preemption.[8]

IV. *Implied Preemption Under the Federal Food, Drug and Cosmetic Act*

A. *Occupation of the Field*

In 1994, Congress enacted the Dietary Supplement Health and Education Act. In plain political terms, the Dietary Supplement Heath and Education Act was a slap at the FDA (Food and Drug Administration). Consumers had feared the FDA was seeking to subject vitamins and minerals to the same expensive premarket approval processes that prescription drugs are subjected to. (See *Nutritional Health Alliance v. Shalala* (S.D.N.Y. 1997) 953 F.Supp. 526, 528 ["Concern over excessive regulation of dietary supplements and the suppression of truthful information drove the passage of the DSHEA, and the mandates and tone of the DSHEA signal a shift to a more permissive approach to health claims on labels."]; Note, *Dietary Supplements and Their*

---

[7]This scenario itself entails some unexplored territory. As one commentator (arguing for a private right of action under federal law) has noted: "When advertisers have complied with FTC regulations, they may not be in compliance with individual state consumer protection statutes. Conversely, a determination by a court that a particular advertisement was not deceptive is not binding on the FTC in its own determination of unfairness. It is unknown whether the FTC has the authority to preempt state law when it promulgates false advertising rules, and therefore, whether states which formulate a consumer protection policy that is inconsistent with the FTC would be preempted." (Note, *Letting Consumers Stand on Their Own: An Argument for Congressional Action Regarding Consumer Standing for False Advertising Under Lanham Act Section 43(a), supra,* 24 Sw. U. L.Rev. at p. 238, fns. omitted.)

[8]It is unlikely in any event that defendants could show impossibility even if the Federal Trade Commission were to seek a national labeling disclaimer. Assuming that the plaintiffs were able to prove their case, the likely outcome is that any disclaimer sought by the Federal Trade Commission and any one imposed by a court in this case would be substantively consistent, i.e., they'd both say the product was not effective to achieve weight loss or ameliorate or cure herpes infections.

*Discontents: FDA Regulation and the Dietary Supplement Health and Educa-tion Act of 1994, supra,* 31 Rutgers L. J. at p. 513 ["Popular support for DSHEA was overwhelming, and '[m]any members of the House of Repre-sentatives and Senate stated that they were receiving more mail, more phone calls, and generally more constituent pressure on this subject than anything else—including health care reform, abortion, or the deficit.' "].) Thus the core of the Dietary Supplement Heath and Education Act was the exemption of dietary supplements from FDA premarket approval. (21 U.S.C. § 343(r)(6) [exempting claims as to how a nutrient affects the structure or function of the body from FDA premarket approval process].)[9]

As far as the Food, Drug, and Cosmetic Act is concerned, it would be more accurate to say the act evidences, far from implied preemption, an instance of implied *non*preemption. Congress wrote a specific preemption provision for medical devices in the Food, Drug, and Cosmetic Act. (21 U.S.C. § 360k(a).) The obvious implication is that no preemption was intended for other items covered by the Act. (See *Cipollone v. Liggett Group, Inc., supra,* 505 U.S. at p. 517 [112 S.Ct. at p. 2618] ["Congress' enactment of a provision defining the pre-emptive reach of a statute implies that matters beyond that reach are not pre-empted"].)

Moreover, as with the Federal Trade Commission Act, there is no private cause of action to enforce the provisions of the Food, Drug and Cosmetic Act. In fact, there is an express provision in the act precluding private causes of action. (21 U.S.C. § 337(a); see, e.g., *Bailey v. Johnson* (6th Cir. 1995) 48 F.3d 965.)[10]

As we have seen, the policy choice by Congress not to allow private causes of action leaves a considerable amount of room left for the states to occupy. This conclusion is necessarily strengthened by the deregulative aspects of the Dietary Supplement Health and Education Act. That act affirmatively removes from the FDA the authority to ban dietary supple-ments on the basis of a lack of effectiveness as shown by FDA premarket approval processes.[11]

There is, however, one wrinkle inherent in the Food, Drug and Cosmetic Act's express prohibition on private causes of action, which the facts in the case before us highlight. With regard to at least the Herp-eeze product, the

---

[9]There was also an exemption for the use of third party literature in connection with the sale of a dietary supplement. (See 21 U.S.C. § 343-2(a).)

[10]States are, however, allowed to bring actions in their own names. (21 U.S.C. § 337(b).)

[11]Safety is another matter. The FDA retains the power, under 21 United States Code section 342(f), to take action against unsafe or adulterated dietary supplements.

complaint appears to be alleging that defendants have made what the litera-ture calls a "drug" claim (e.g., the product cures or alleviates disease) for the product, as distinct from a "structure or function" claim (e.g., strengthens the immune system which in turn protects against a variety of diseases).

The question therefore arises as to whether the suit before us may be properly characterized as an attempt to circumvent the express prohibition on private causes of action in the Food, Drug and Cosmetic Act. Arguably, one might say that Congress has committed to the FDA, and not state courts in unfair competition litigation, the question of whether a dietary supplement manufacturer has crossed the line from making a "structure or function" claim to making a "drug" claim.

The answer here is to go back to what is in plain sight. This litigation is not about whether the defendants' products crossed the line from being supplements to being drugs. The plaintiff here is not suing to subject Medi-Phen or Herp-Eeze to the *FDA* premarket approval process, but to stop what it claims is the false advertising of those products as safe and effective. There is a difference between the FDA's premarket gauntlet and state litigation which tests the veracity of claims made on behalf of products already on the market.

We should not forget the "food" in the "Food, Drug and Cosmetic Act." In terms of FDA regulation, dietary supplements are now in a category that treats them as food, not drugs. (See 21 U.S.C. § 321(ff).) And foods are regularly subject to state unfair competition litigation.[12] The picture that thus emerges is not one of preemption with no room left for the state to do anything, but of complementary schemes: One which allows dietary supplements to reach the market, the other which allows claims made on behalf of those supplements to be tested in court for veracity.

### B. *Conflict*

That leaves only the question of whether the instant litigation poses an outcome where the defendants could not possibly comply with the federal

[12]Two of the most prominent cases from California are *Committee on Children's Television, Inc. v. General Foods Corp.* (1983) 35 Cal.3d 197 [197 Cal.Rptr. 783, 673 P.2d 660] (unfair competition claims allowed against makers of "sugared cereals" containing up to 50 percent sugar by weight) and *Consumers Union of U.S., Inc. v. Alta-Dena Certified Dairy* (1992) 4 Cal.App.4th 963 [6 Cal.Rptr.2d 193] (trial court had power under unfair competition law to order disclaimers and warnings labels on containers of raw milk). Neither case, however, dealt with federal preemption.

Interestingly enough, the two cases implicated an almost mutually exclusive set of consumers. We doubt very much if many people have ever poured raw milk on a bowl of Sugar Crisp.

law. At one level, this would seem to be an easy question. There is nothing in the federal law that *requires* the defendants to produce the two products in question, or to make affirmative statements promoting their products. Thus, it would appear, any relief afforded the plaintiff in this litigation would, by definition, not pose the problem of impossibility of compliance.

However, there is a tricky part, based on a statute that doesn't preempt state activity, but certainly puts some limits on it. Title 21 United States Code section 343-1(a)(5) provides that "no state . . . may . . . establish . . . as to any food in interstate commerce . . . any requirement respecting any claim of the type described in section 343(r)(1) of this title, made in the label or labeling of food *that is not identical* to the requirement of section 343(r) . . . ." (Italics added.)

The cross-referenced statute, 21 United States Code section 343(r), sets forth a variety of complicated rules regarding the labeling of food. (For example, one of the more straightforward is that the label of a food containing cholesterol may not make a claim regarding the level of saturated fat in the food unless the label also discloses in "immediate proximity" to the claim the food's level of cholesterol (21 U.S.C. § 343(r)(2)(A)(iv)).)

Title 21 United States Code section 343(r) is not the clearest legislation ever written. To be truthful, it is a nightmare of internal cross-references,[13] which makes parts of the Internal Revenue Code read like Hemingway in comparison. However, one thing is unavoidably clear from 21 United States Code section 343-1(a)(5): States *can* enforce labeling rules which *are* identical to those found in 21 United States Code section 343(r).[14] And while it may be a difficult task for a state court to craft injunctive relief involving the *labeling* of a dietary supplement that is identical to the rules set forth in 21 United States Code section 343(r), it is not an impossible task. Relief can be afforded in this case that is wholly consistent with 21 United States Code section 343(r).

To illustrate, let's take one of the most important aspects of 21 United States Code section 343(r) specifically governing dietary supplements—part (r)(6). That provision allows a statement to be made on the label of a dietary

---

[13]E.g.: "A statement of the type required by paragraph (q) of this section that appears as part of the nutrition information required or permitted by such paragraph is not a claim which is subject to this paragraph and a claim subject to clause (A) is not subject to clause (B)."

[14]In fact, California has food branding requirements that explicitly incorporate 21 United States Code section 343(r). (See Health & Saf. Code, § 110670 ["Any food is misbranded if its labeling does not conform with the requirements for nutrient content or health claims as set forth in Section 403(r) [21 United States Code section 343(r)] of the federal act . . . ."].)

supplement that "describes the role of a nutrient or dietary ingredient intended to affect the structure or function in humans." If such a statement is made, then part (r)(6)(C) requires this disclaimer: "This statement has not been evaluated by the Food and Drug Administration. This product is not intended to diagnose, treat, cure, or prevent any disease."

The obvious reason for this federally required disclaimer is to tell the consumer that the product is not a drug. If the product were intended to treat a disease, then it would be subject to the pre-market approval gauntlet as a drug. (See 21 U.S.C. § 321(g)(1)(B) [defining drugs to include "articles intended for use in the diagnosis, cure, mitigation, treatment, or prevention of disease"].)

If, for example, one of the results of this case were that Olympian Labs was required to affirmatively state, in regard to any *product literature* connected with Herp-Eeze (not necessarily on the label), that "this product is not intended to treat or cure any condition of herpes simplex virus," there would be no inconsistency with 21 United States Code section 343(r)(6). The state litigation would not have resulted in a labeling requirement any different from that of federal law. The complaint, contrary to Consumer Justice's characterization of it in its reply to the brief filed by amicus curiae, is not confined to relief concerning the products' labels. Additionally, a state is free, under the plain terms of 21 United States Code section 343-1(a)(5), to impose even a labeling requirement that is "identical" to one found in 21 United States Code section 343(r).[15]

## V.  *Disposition*

The judgment of dismissal is reversed. We must now stress the narrowness of our decision. The briefing has only dealt with the preemption issue, and defendants have asserted no alternative grounds in their briefs for upholding the judgment.[16]

Our opinion should therefore not be read as saying anything beyond the federal preemption issue as presented by the complaint. Specifically we do not consider whether, independent of preemption, plaintiff has properly

---

[15]Whether that exercise would be a redundancy of what might already be on the labels of Medi-Phen or Herp-Eeze is not before us. Surely, however, defendants cannot claim "conflict" preemption based on a state court order that forced them to do something they would have to do anyway under federal law.

[16]Because we deal with the preemption issue strictly as a matter of law based on the language of the applicable federal statutes, we deny Consumer Justice's request for judicial notice filed July 24, 2001, as it is based on materials irrelevant to our consideration.

stated a cause of action under the unfair competition law.[17] Nor do we consider any issue of the burden on interstate commerce resulting from individual states being able to grant relief for the false advertising of dietary supplements. The question of interstate commerce is distinct from the question of federal preemption.[18]

Because of the necessarily interlocutory nature of our decision, the interests of justice dictate that each side will bear its own costs on appeal.

Rylaarsdam, J., and O'Leary, J., concurred.

---

[17]Much of defendants' briefing has actually stressed the absence of private federal causes of action under the Federal Trade Commission Act and the Food, Drug, and Cosmetic Act. The underlying assumption is that this lawsuit is somehow an attempt to use state unfair competition laws to enforce *federal* laws. No, the lawsuit is about state unfair advertising laws. The parties have not briefed, and we do not address, the question of whether the substantive *state* law requires there to be a viable federal private cause of action.

[18]It appears the trial judge was influenced by the prospect of forcing dietary supplements to meet "fifty different standards in fifty different sales jurisdictions." However, while the need for uniform national regulation may be a very good reason for Congress to preempt a field, it doesn't necessarily follow that Congress has exercised its power to so preempt. If the mere need for national uniformity were enough to establish preemption, then almost all commercial regulation would be exclusively a federal matter.