BILL LOCKYER Attorney General DANIEL G. STONE Deputy Attorney General
THE HONORABLE LYNN DAUCHER, MEMBER OF THE STATE ASSEMBLY, has requested an opinion on the following question:
Are the Cable Television and Customer Service and Information Act and the Video Customer Service Act preempted by federal law insofar as they apply to providers of direct broadcast satellite services?
 CONCLUSION
The Cable Television and Customer Service and Information Act and the Video Customer Service Act are not preempted by federal law insofar as they apply to providers of direct broadcast satellite services, except that the state may not authorize a local tax or fee upon such services.
 ANALYSIS
We are called upon to consider the interplay between state and federal statutes regulating businesses that provide direct broadcast satellite ("DBS") services, also known as direct-to-home satellite services. The principal laws at issue are two California acts — the Cable Television and Customer Service and Information Act (Gov. Code, §§ 53054-53056; "Cable Act")[1] and the Video Customer Service Act (§§ 53088-53088.2; "Video Act"), and provisions in two federal acts — section 303(v) of the Communications Act of 1934 (Stats. 1934, ch. 652; "section 303(v)") and section 602 of the Telecommunications Act of 1996 (Pub.L. No. 104-104, 110 Stats. 56
(1996); "section 602"). We are asked whether the state acts, to the extent that they apply to providers of DBS services, are preempted by section 303(v) or section 602. We conclude that these federal laws do not have a preemptive effect except for the prohibition contained in section 602 against the imposition of fees or taxes on such services.
First, we note that the Legislature enacted the Cable Act in 1992 (Stats. 1992, ch. 262, § 1) as a consumer protection measure. Subdivision (a) of section 53054.1 declared in part:
 ". . . [C]ustomers of cable and video providers should get their money's worth for the service they subscribe to, and one way to ensure this is to encourage that customer service standards be established and that customers be informed [as] to those standards."
For purposes of this statutory scheme, the term "video provider" includes ". . . providers of cable television, master antenna television, satellite master antenna television, direct broadcast satellite, multipoint distribution service, and other providers of video programming, whatever their technology." (§ 53054.2, subd. (c).) Section 53055 requires the establishment of various customer service standards:
 "Each cable television operator or video provider in the state shall establish customer service standards. These customer service standards shall include, but not be limited to, standards regarding the following:
 "(a) Installation, disconnection, service and repair obligations, employee identification, and service call response time and scheduling.
 "(b) Customer telephone and office hours; procedures for billing, charges, refunds, and credits.
"(c) Procedures for termination of service.
 "(d) Notice of the deletion of a programming service, the changing of channel assignments, or an increase in rates.
 "(e) Complaint procedures and procedures for bill dispute resolution."
Subdivision (a) of section 53055.1, in turn, requires that cable television operators and video providers distribute notices describing these customer service standards "to employees, to each customer, and to the city, county, or city and county in which the cable television operator or video provider furnishes service to customers. . . ." In addition, each operator and provider must file an annual report on its performance ". . . with regard to meeting its customer service standards." (§ 53055.2.) Local governments may establish a "schedule of penalties" for the failure of operators or providers to distribute their annual notices as set forth in section 53056:
 "(a) The legislative body of the city, county, or city and county in which the cable television operator or video provider furnishes service to customers may, by ordinance, provide a schedule of penalties for the failure of the cable television operator or video provider to distribute the annual notice required by Section 53055.1, not to exceed five hundred dollars ($500) for each year in which the notice is not distributed to all customers.
 "(b) The city, county, or city and county shall give a cable television operator or video provider written notice of any alleged failure to distribute to all customers the annual notice required by Section 53055.1 before imposing any penalty pursuant to subdivision (a). If the cable television operator or video provider distributes this notice to all customers within 60 days after receipt of the notice from the city, county, or city and county pursuant to this subdivision, no penalty shall be imposed upon the cable television operator or video provider pursuant to subdivision (a)."
The Video Act was also enacted by the Legislature in 1992 (Stats. 1992, ch. 1198, § 1) as a consumer protection measure. It defines the term "video provider" to include providers of DBS services. (§ 53088.1, subd. (a).) Section 53088.2 imposes the following requirements:
 "(a) Every video provider shall render reasonably efficient service, make repairs promptly, and interrupt service only as necessary.
 "(b) All video provider personnel contacting subscribers or potential subscribers outside the office of the provider shall be clearly identified as associated with the video provider.
 "(c) At the time of installation, and annually thereafter, all video providers shall provide to all customers a written notice of the programming offered, the prices for that programming, the provider's installation and customer service policies, and the name, address, and telephone number of the local franchising authority.
 "(d) All video providers shall have knowledgeable, qualified company representatives available to respond to customer telephone inquiries Monday to Friday, inclusive, excluding holidays, during normal business hours.
 "(e) All video providers shall provide to customers a toll-free or local telephone number for installation, and service, and complaint calls. These calls shall be answered promptly by the video providers. The city, county, or city and county may establish standards for what constitutes promptness.
 "(f) All video providers shall render bills that are accurate and understandable.
 "(g) All video providers shall respond to a complete outage in a customer's service promptly. The response shall occur within 24 hours of the reporting of the outage to the provider, except in those situations beyond the reasonable control of the video provider. A video provider shall be deemed to respond to a complete outage when a company representative arrives at the outage location within 24 hours and begins to resolve the problem.
 "(h) All video providers shall provide a minimum of 30 days' written notice before increasing rates or deleting channels. All video providers shall make every reasonable effort to submit the notice to the city, county, or city and county in advance of the distribution to customers. The 30-day notice is waived if the increases in rates or deletion of channels were outside the control of the video provider. In those cases the video provider shall make reasonable efforts to provide customers with as much notice as possible.
 "(i) Every video provider shall allow every residential customer who pays his or her bill directly to the video provider at least 15 days from the date the bill for services is mailed to the customer, to pay the listed charges unless otherwise agreed to pursuant to a residential rental agreement establishing tenancy. Customer payments shall be posted promptly. No video provider may terminate residential service for nonpayment of a delinquent account unless the video provider furnishes notice of the delinquency and impending termination at least 15 days prior to the proposed termination. The notice shall be mailed, postage prepaid, to the customer to whom the service is billed. Notice shall not be mailed until the 16th day after the date the bill for services was mailed to the customer. The notice of delinquency and impending termination may be part of a billing statement. No video provider may assess a late fee any earlier than the 22nd day after the bill for service has been mailed.
 "(j) Every notice of termination of service pursuant to subdivision (i) shall include all of the following information:
 "(1) The name and address of the customer whose account is delinquent.
"(2) The amount of the delinquency.
 "(3) The date by which payment is required in order to avoid termination of service.
 "(4) The telephone number of a representative of the video provider who can provide additional information and handle complaints or initiate an investigation concerning the service and charges in question.
 "Service may only be terminated on days in which the customer can reach a representative of the video provider either in person or by telephone.
 "(k) Any service terminated without good cause shall be restored without charge for the service restoration. Good cause includes, but is not limited to, failure to pay, payment by check for which there are insufficient funds, theft of service, abuse of equipment or system personnel, or other similar subscriber actions.
 "(l) All video providers shall issue requested refund checks promptly, but no later than 45 days following the resolution of any dispute, and following the return of the equipment supplied by the video provider, if service is terminated.
 "(m) All video providers shall issue security or customer deposit refund checks promptly, but no later than 45 days following the termination of service, less any deductions permitted by law.
 "(n) Video providers shall not disclose the name and address of a subscriber for commercial gain to be used in mailing lists or for other commercial purposes not reasonably related to the conduct of the businesses of the video providers or their affiliates, unless the video providers have provided to the subscriber a notice, separate or included in any other customer notice, that clearly and conspicuously describes the subscriber's ability to prohibit the disclosure. Video providers shall provide an address and telephone number for a local subscriber to use without toll charge to prevent disclosure of the subscriber's name and address.
 "(o) Disputes concerning the provisions of this article shall be resolved by the city, county, or city and county in which the customer resides. For video providers under Section 53066, the franchising authority shall resolve disputes. All other video providers shall register with the city in which they provide service or, where the customers reside in an unincorporated area, in the county in which they provide service. The registration shall include the name of the company, its address, its officers, telephone numbers, and customer service and complaint procedures. Counties and cities may charge these other video providers operating in the state a fee to cover the reasonable cost of administering this division.
 "(p) Nothing in this division limits any power of a city, county, or city and county or video provider to adopt and enforce service standards and consumer protection standards that exceed those established in this division.
 "(q) The legislative body of the city, county, or city and county, may, by ordinance, provide a schedule of penalties for the material breach by a video provider of subdivisions (a) to (p), inclusive. No monetary penalties shall be assessed for a material breach if the breach is out of the reasonable control of the video provider. Further, no monetary penalties may be imposed prior to the effective date of this section. Any schedule of monetary penalties adopted pursuant to this section shall in no event exceed two hundred dollars ($200) for each day of each material breach, not to exceed six hundred dollars ($600) for each occurrence of material breach. However, if a material breach of any of subdivisions (a) to (p), inclusive, has occurred and the city, county, or city and county has provided notice and a fine or penalty has been assessed, in a subsequent material breach of the same nature occurring within 12 months, the penalties may be increased by the city, county, or city and county to a maximum of four hundred dollars ($400) for each day of each material breach, not to exceed one thousand two hundred dollars ($1,200) for each occurrence of the material breach. If a third or further material breach of the same nature occurs within those same 12 months, and the city, county, or city and county has provided notice and a fine or penalty has been assessed, the penalties may be increased to a maximum of one thousand dollars ($1,000) for each day of each material breach, not to exceed three thousand dollars ($3, 000) for each occurrence of the material breach. With respect to video providers subject to a franchise or license, any monetary penalties assessed under this section shall be reduced dollar for dollar to the extent any liquidated damage or penalty provision of a current cable television ordinance, franchise contract, or license agreement imposes a monetary obligation upon a video provider for the same customer service failures, and no other monetary damages may be assessed. However, this section shall in no way affect the right of franchising authorities concerning assessment or renewal of a cable television franchise under the provisions of the Cable Communications Policy Act of 1984 (47 U.S.C. Sec. 521 et seq.).
 "(r) If the legislative body of a city, county, or city and county adopts a schedule of monetary penalties pursuant to subdivision (q), the following procedures shall be followed:
 "(1) The city, county, or city and county shall give the video provider written notice of any alleged material breaches of the consumer service standards of this division and allow the video provider at least 30 days from receipt of the notice to remedy the specified breach.
 "(2) A material breach for the purposes of assessing penalties shall be deemed to have occurred for each day, following the expiration of the period specified in paragraph (1), that any material breach has not been remedied by the video provider, irrespective of the number of customers affected.
 "(s) Notwithstanding subdivision (o), or any other provision of law, this section shall not preclude a party affected by this section from utilizing any judicial remedy available to that party without regard to this section. Actions taken by a local legislative body, including a franchising authority, pursuant to this section shall not be binding upon a court of law. For this purpose a court of law may conduct de novo review of any issues presented."
Regarding the two federal statutory provisions in question, section 303(v) states as follows:
 "Except as otherwise provided in this chapter, the [Federal Communications] Commission from time to time, as public convenience, interest, or necessity requires, shall —
". . . . . . . . . . . . . . . . . . . . . . . . . .
 "(v) Have exclusive jurisdiction to regulate the provision of direct-to-home satellite services. As used in this subsection, the term `direct-to-home satellite services' means the distribution or broadcasting of programming or services by satellite directly to the subscriber's premises without the use of ground receiving or distribution equipment, except at the subscriber's premises or in the uplink process to the satellite."
Section 602 added the following relevant language as a note to title 47 United States Code section 152:
 "(a) Preemption. A provider of direct-to-home satellite service shall be exempt from the collection or remittance, or both, of any tax or fee imposed by any local taxing jurisdiction on direct-to-home satellite service.
"(b) Definitions. For the purposes of this section —
". . . . . . . . . . . . . . . . . . . . . . . . . .
 "(3) Local Taxing Jurisdiction. The term `local taxing jurisdiction' means any municipality, city, county, township, parish, transportation district, or assessment jurisdiction, or any other local jurisdiction in the territorial jurisdiction of the United States with the authority to impose a tax or fee, but does not include a State.
". . . . . . . . . . . . . . . . . . . . . . . . . .
 "(5) Tax or Fee. The terms `tax' and `fee' mean any local sales tax, local use tax, local intangible tax, local income tax, business license tax, utility tax, privilege tax, gross receipts tax, excise tax, franchise fees, local telecommunications tax, or any other tax, license, or fee that is imposed for the privilege of doing business, regulating, or raising revenue for a local taxing jurisdiction.
". . . . . . . . . . . . . . . . . . . . . . . . . ."
Having set out the four state and federal legislative schemes at issue, we turn to the doctrine of federal preemption. Clause 2 of article VI of the United States Constitution, known as the "supremacy clause," provides:
 "This Constitution, and the laws of the United States which shall be made in pursuance thereof . . . shall be the supreme law of the land; and the judges in every state shall be bound thereby, any thing in the Constitution or laws of any state to the contrary notwithstanding."
Under the supremacy clause, Congress has the power to preempt state law concerning matters that lie within the authority of Congress. (Crosby v. National Foreign Trade Council (2000)530 U.S. 363, 372; Bronco Wine Co. v. Jolly (2004) 33 Cal.4th 943,955.) In 68 Ops.Cal.Atty.Gen. 209, 220 (1985), we observed:
 ". . . [T]he Constitution and laws of the United States are the supreme law of the land, and to these every citizen of every state owes allegiance, whether in his individual or official capacity. [Citation.] The supremacy clause requires that every state provision, including those enacted by ballot and accorded state constitutional stature, conform to federal constitutional standards. [Citation.] Consequently, both the constitution and laws of a state, so far as they are repugnant to the Constitution and laws of the United States, are absolutely void. [Citations.]"[2]
In determining whether a particular federal law preempts a state law, we look to the intent of Congress. In English v.General Electric Co. (1990) 496 U.S. 72, 78-79, the court set forth the applicable rules:
 ". . . Our cases have established that state law is pre-empted under the Supremacy Clause . . . in three circumstances. First, Congress can define explicitly the extent to which its enactments pre-empt state law. [Citation.] Pre-emption fundamentally is a question of congressional intent, [citation], and when Congress has made its intent known through explicit statutory language, the courts' task is an easy one.
 "Second, in the absence of explicit statutory language, state law is pre-empted where it regulates conduct in a field that Congress intended the Federal Government to occupy exclusively. Such an intent may be inferred from a `scheme of federal regulation . . . so pervasive as to make reasonable the inference that Congress left no room for the States to supplement it,' or where an Act of Congress `touch[es] a field in which the federal interest is so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject.' [Citation.]. . . .
 "Finally, state law is pre-empted to the extent that it actually conflicts with federal law. Thus, the Court has found pre-emption where it is impossible for a private party to comply with both state and federal requirements, [citation], or where state law `stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.' [Citations.]"
Once it is found that Congress has intended to preempt state law in a particular field, the scope of the preemption is again dependent upon the intent of Congress. In Medtronic, Inc. v.Lohr (1996) 518 U.S. 470, the court examined a federal statute that expressly preempted state law. The court analyzed the governing principles in determining the scope of the federal statute's preemptive effect as follows:
 "As in Cipollone v. Liggett Group, Inc., 505 U.S. 504, 112 S.Ct. 2608, 120 L.Ed.2d 407 (1992), we are presented with the task of interpreting a statutory provision that expressly pre-empts state law. . . . Although our analysis of the scope of the pre-emption statute must begin with its text, [citation], our interpretation of that language does not occur in a contextual vacuum. Rather, that interpretation is informed by two presumptions about the nature of pre-emption. [Citation.]
 "First, because the States are independent sovereigns in our federal system, we have long presumed that Congress does not cavalierly pre-empt state-law causes of action. In all pre-emption cases, and particularly in those in which Congress has `legislated . . . in a field which the States have traditionally occupied,' [citation], we `start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress.' [Citations.] Although dissenting Justices have argued that this assumption should apply only to the question whether Congress intended any pre-emption at all, as opposed to questions concerning the scope of its intended invalidation of state law, [citation], we used a `presumption against the pre-emption of state police power regulations' to support a narrow interpretation of such an express command in Cipollone. [Citation.] That approach is consistent with both federalism concerns and the historic primacy of state regulation of matters of health and safety.
 "Second, our analysis of the scope of the statute's pre-emption is guided by our oft-repeated comment . . . that `[t]he purpose of Congress is the ultimate touchstone' in every pre-emption case. [Citations.] As a result, any understanding of the scope of a pre-emption statute must rest primarily on `a fair understanding of congressional purpose.' [Citation.] Congress' intent, of course, primarily is discerned from the language of the pre-emption statute and the `statutory framework' surrounding it. [Citation.] Also relevant, however, is the `structure and purpose of the statute as a whole,' [citation], as revealed not only in the text, but through the reviewing court's reasoned understanding of the way in which Congress intended the statute and its surrounding regulatory scheme to affect business, consumers, and the law." (Id. at pp. 4844-86.)
Applying these governing principles to the two federal statutes in question, we find that Congress did not intend to preempt the Cable Act or the Video Act except for the federal prohibition against the imposition of local taxes or fees upon businesses providing DBS services.
1. Section 303(v)
We first consider whether section 303(v), granting the Federal Communications Commission ("FCC") exclusive jurisdiction "to regulate the provision of direct-to-home satellite services," preempts the Cable Act or the Video Act. The term "provision" contained in section 303(v) could be construed as referring to the technological processes involved in transmitting signals and programming directly from satellites to subscribers. Alternatively, it might be read more broadly to mean all things relating to the business of providing such services — including the contractual relationships between DBS providers and their customers, and consumer-protection standards governing such relationships.
In looking at these two alternatives, we are directed to adopt the more narrow construction, guided by the principle that any preemptive effect upon state regulation requires the unmistakable intent of Congress. (Medtronic, Inc. v. Lohr, supra, 518 U.S. at p. 485; Zolezzi v. PacifiCare of California (2003)105 Cal.App.4th 573, 581-582, 587.) Following this principle, we construe the term "provision" in section 303(v) as including only the satellite signal delivery system — that is, the technical transmission process described in section 303(v): "the distribution or broadcasting of programming or services by satellite directly to the subscriber's premises without the use of ground receiving or distribution equipment, except at the subscriber's premises or in the uplink process to the satellite." (See City of New York v. FCC (1988) 486 U.S. 57, 69 [FCC's regulations preempt state and local "technical standards governing the quality of cable [television] signals"]; OperaPlaza Residential Parcel v. Hoang (9th Cir. 2004) 376 F.3d 831,838-839 [FCC regulations may preempt state regulation of certain antennae and satellite receivers]; Freeman v. BurlingtonBroadcasters, Inc. (2d Cir. 2000) 204 F.3d 311, 320 [finding ". . . that Congress intended the FCC to possess exclusive authority over technical matters related to radio broadcasting"]; Broyde v. Gotham Tower, Inc. (6th Cir. 1994) 13 F.3d 994, 997 ["FCC's jurisdiction `over technical matters' associated with the transmission of radio signals `is clearly exclusive'"].)
The manner in which the FCC has exercised its regulatory authority over satellite communications is consistent with this more narrow construction of the term "provision" in section 303(v). Pursuant to its administrative responsibilities (see, e.g., 47 U.S.C. § 335(a)), the FCC has promulgated a number of regulations governing DBS service providers — regulations concerning such technical matters as space station and earth station authorization and specifications; licensing of such stations, including license terms, modifications, and renewals; construction permits; assignments of orbital locations; assignments of frequency bands; analyses of frequency interference; standards for antenna performance; etc. (See, 47 C.F.R. §§ 25.101-25.701 (2005).) The FCC's regulations do not address matters of consumer protection in the relationship between DBS service providers and their subscribers.
Hence, section 303(v) requires exclusive federal jurisdiction in the realm of satellite specifications, orbital assignments, allocation of frequency bands, transmission standards, and similar technical matters. On the other hand, matters of consumer protection, a traditional area of state responsibility, are left to state regulation. (See Bronco Wine Co. v. Jolly, supra,
33 Cal.4th at pp. 959, 995; Zolezzi v. PacifiCare of California,supra, 105 Cal.App.4th at pp. 581-582, 587; Consumer JusticeCenter v. Olympian Labs, Inc. (2002) 99 Cal.App.4th 1056,1060-1061.) The consumer protection standards of the Cable Act and the Video Act are thus not preempted by section 303(v).
2. Section 602
As to Section 602's prohibition against the imposition of a "tax or fee" by a local agency, we note that the term "tax" does not appear in the Cable Act or the Video Act, and the term "fee" appears in these statutes in reference to fees charged by video providers to their subscribers. (See, e.g., §§ 53054.2; 53088.1, subd. (a); 53088.2, subd. (i).) The one exception is section 53088.2, subdivision (o), which states:
 "Disputes concerning the provisions of this article shall be resolved by the city, county, or city and county in which the customer resides. For video providers under Section 53066 [concerning construction of community antenna television systems], the franchising authority shall resolve disputes. All other video providers shall register with the city in which they provide service or, where the customers reside in an unincorporated area, in the county in which they provide service. The registration shall include the name of the company, its address, its officers, telephone numbers, and customer service and complaint procedures. Counties and cities may charge these other video providers operating in the state a fee to cover the reasonable cost of administering this division." (Italics added.)
We believe that the administrative fee of section 53088.2, subdivision (o), constitutes a fee ". . . for the privilege of doing business, regulating, or raising revenue for a local taxing jurisdiction" (see Sinclair Paint Co. v. State Bd. ofEqualization (1997) 15 Cal.4th 866, 873-881), and thus directly conflicts with the express exemption from such local fees provided in section 602 (see English v. General Electric Co.,supra, 496 U.S. at pp. 78-79; Florida Avocado Growers v. Paul
(1963) 373 U.S. 132, 142-143; Screen Extras Guild, Inc. v.Superior Court (1990) 51 Cal.3d 1017, 1023-1024; 79 Ops.Cal.Atty.Gen. 76, 82 (1996); 75 Ops.Cal.Atty.Gen. 270, 276-277 (1992)).
In contrast, the "penalties" authorized in the Cable Act and the Video Act for violations of the consumer protection standards (§§ 53056, 53088.2, subds. (q), (r)) would not be equivalent to a "tax" or "fee." Instead, they would constitute "a sum of money exacted as punishment" or "[a] fine assessed for a violation of a statute or regulation." (Black's Law Dict. (8th ed. 2004) p. 1168, col. 2; see Sanders v. Pacific Gas Elec. Co. (1975)53 Cal.App.3d 661, 666-667; Bisno v. Sax (1959)175 Cal.App.2d 714, 725; In re George (9th Cir. 2004) 361 F.3d 1157, 1160.) Consequently, such penalties would not be preempted by section 602's exemption of DBS service providers from local taxes and fees.
We conclude that the Cable Act and the Video Act are not preempted by federal law insofar as they apply to providers of DBS services, except that the state may not authorize a local tax or fee upon such services.
[1] All references hereafter to the Government Code are by section number only.
[2] Although the California Constitution prohibits an administrative agency from refusing "to enforce a statute on the basis that federal law or federal regulations prohibit enforcement of such statute unless an appellate court has made a determination that the enforcement of such statute is prohibited by federal law or federal regulations" (Cal. Const., art. III, §3.5, subd. (c)), the supremacy clause requires state and local officials "to act in accordance with the federal law and to disregard conflicting state constitutional and statutory provisions." (68 Ops.Cal.Atty.Gen., supra, at p. 221.)