[No. G034991. Fourth Dist., Div. Three. June 20, 2006.]

PACIFIC BELL WIRELESS, LLC, Petitioner, v.
PUBLIC UTILITIES COMMISSION, Respondent;
UTILITY CONSUMERS' ACTION NETWORK, Real Party in Interest.

722

## COUNSEL

O'Melveny & Myers, Charles C. Read, Michael A. Gatto and Walter Dellinger for Petitioner.

Munger, Tolles & Olson and Henry Weissmann for Cellco Partnership as Amicus Curiae on behalf of Petitioner.

Law Offices of Earl Nicholas Selby and Earl Nicholas Selby for Nextel of California, Inc., as Amicus Curiae on behalf of Petitioner.

Sprint Law Department and Stephen H. Kukta for Sprint Telephony PCS, L.P., Sprint Spectrum L.P., and Wireless Co., L.P., as Amici Curiae on behalf of Petitioner.

Wilson & Bloomfield and Leon Bloomfield for Omnipoint Communications, Inc., as Amicus Curiae on behalf of Petitioner.

Cooper, White & Cooper and Sean P. Beatty for California Telephone Association as Amicus Curiae on behalf of Petitioner.

James B. Young for Pacific Bell Telephone Company (SBC California) as Amicus Curiae on behalf of Petitioner.

Russell C. Swartz for Southern California Edison Company as Amicus Curiae on behalf of Petitioner.

W. Davis Smith for Southern California Gas Company and San Diego Gas & Electric Company as Amici Curiae on behalf of Petitioner.

Elaine M. Duncan for Verizon California Inc., as Amicus Curiae on behalf of Petitioner.

Randolph L. Wu, Dale Holzschuh, Kimberly J. Lippi, Helen W. Yee and Carrie G. Pratt for Respondent.

Rosner, Law & Mansfield and Alan M. Mansfield for Real Party in Interest.

## OPINION

**FYBEL, J.—**

### INTRODUCTION

After an investigation, a nine-day evidentiary hearing before an administrative law judge, and a review by the full California Public Utilities Commission of the State of California (the Commission), the Commission imposed a multimillion dollar fine against Pacific Bell Wireless, LLC, doing business as Cingular Wireless (Cingular) for two interrelated violations of law. First, the Commission found Cingular's policy of charging its customers an early termination fee to cancel a wireless telephone service contract without permitting any type of grace period was an unjust and unreasonable practice, particularly when Cingular admitted the best way for customers to decide whether Cingular's service would work for them was to try the service for some period of time. Second, the Commission found that Cingular failed to disclose to its customers known network problems and misled its customers regarding the wireless network's coverage and service, which were also unjust and unreasonable practices. Cingular challenges the Commission's decision and its later order modifying the decision and denying rehearing.

The issues raised by Cingular are whether the Commission acted without or in excess of its jurisdiction, and whether the Commission's decisions violate Cingular's constitutional right to due process. As detailed *post*, we conclude the Commission did not exceed its jurisdiction and did not violate Cingular's due process rights. Therefore, we deny the petition for a writ of review for the following reasons:

1. Cingular first argues the Commission's decisions are preempted by federal law. We disagree. While the Commission is preempted from regulating either rates or the entry of a wireless provider into the market, it is not preempted from regulating other terms and conditions of wireless telephone service. We conclude the imposition of fines and the requirement that Cingular refund early termination fees paid by its customers were neither regulation of rates nor regulation of market entry. The principal purposes of the penalties imposed by the Commission were to compensate Cingular's customers and to prevent further misrepresentations by Cingular. The effect of the penalties on Cingular's rates is indirect and incidental.

2. Cingular next argues the Commission lacks jurisdiction to directly impose penalties, and was required to institute a lawsuit against Cingular in superior court if the Commission intended to seek penalties against Cingular. Again, we disagree. California law permits the Commission to levy fines, but denies it the right to independently collect the fines it levies.

3. Cingular also argues the Commission could not impose a penalty for failure to disclose under Public Utilities Code section 2896, subdivision (a). (All further statutory references are to the Public Utilities Code, unless otherwise noted.) Specifically, Cingular argues it is being punished for failing to disclose information already known to its customers, it is being selectively punished, and noncompliance with section 2896 cannot by itself justify imposition of a penalty. We reject each of these contentions, as detailed *post.*

4. Cingular argues the imposition of a multimillion dollar fine violates due process, because it could not have known the Commission would find Cingular's actions violated certain statutes and an earlier order of the Commission. While the statutes and order are broadly worded, we find no constitutional violation.

5. Finally, Cingular argues the Commission's order that Cingular refund early termination fees to its customers is overbroad. In light of the record as a whole, we must reject this argument.

### STATEMENT OF FACTS[1]

Cingular sells wireless communication services, handsets, and accessories. (*Pacific Bell Wireless LLC doing business as Cingular Wireless* (Cal.P.U.C. Sept. 23, 2004) Dec. No. 04-09-062 [2004 Cal.P.U.C. Lexis 453, *7] (*Cingular I*).) Cingular sells its communication services to individual and business customers under a variety of service plans. (*Ibid.*)

Between 2000 and 2002, Cingular experienced significant growth, both in the number of customers and in the customers' use of Cingular's network as calculated by minutes of use per month. (*Cingular I, supra,* 2004 Cal.P.U.C. Lexis 453 at pp. *20–21.) During most of 2001, Cingular's service suffered in

---

[1] These facts are drawn from the record developed at the evidentiary hearing conducted before an administrative law judge of the Commission in April 2004. On January 12, 2006, we ordered the Commission to certify and return to this court its official record in the proceeding. On March 10, the Commission filed with this court the certified record, including exhibits, reporters' transcripts from the evidentiary hearing and other hearings, and the clerk's transcript. On March 29, we ordered certain portions of the record to be sealed, pursuant to the California Rules of Court, relevant orders of the Commission, and the Commission's unopposed motion.

After the certified record was filed, Utility Consumers' Action Network (UCAN) submitted a letter directing our attention to certain portions of the record. UCAN explained that because the parties' briefs were filed before the certified record with citations was prepared, it would assist this court by providing "a short index of the key evidence." Cingular responded to UCAN's letter, complaining that UCAN's "index" was actually a one-sided summary of the evidence and an attempt to file an unauthorized supplemental brief. We have reviewed the entire certified record (without the assistance of the parties), and have not relied on UCAN's index.

three ways: service denied or blocked calls; lost or dropped calls; and switch congestion. (*Ibid.*) Cingular admitted its growth during this period led to network problems. Cingular therefore expended significant sums on network upgrades to increase performance and coverage areas. (*Id.*, 2004 Cal.P.U.C. Lexis 453 at p. *21.) At the same time, however, Cingular's engineering department was expressing its concerns that the network would be unable to perform adequately, particularly when Cingular was in the midst of a marketing campaign to increase the number of subscribers and the usage by those subscribers. (*Id.*, 2004 Cal.P.U.C. Lexis 453 at pp. *22–24.)

Cingular also admitted it had coverage holes, as do all wireless providers. There was evidence of four types of coverage holes suffered by Cingular: no signal (e.g., coverage is unavailable or service is denied); inadequate signal, where the signal is too weak to permit service; voice channel, where the number of channels is less than required to handle peak traffic; and interference, where one or more signals from other cell cites or users interrupt or degrade a user's conversation. (*Cingular I, supra*, 2004 Cal.P.U.C. Lexis 453 at p. *26, fn. 12.)

Cingular sales agents at both company-owned and agent-owned stores provided customers and potential customers with inaccurate, incomplete and misleading information regarding Cingular's service. Customers were told Cingular provided service in locations where service was not, in fact, available. (*Cingular I, supra*, 2004 Cal.P.U.C. Lexis 453 at p. *33, fn. 17.) Customers requesting information regarding coverage areas were provided with rate area maps. (*Id.*, 2004 Cal. P.U.C. Lexis 453 at pp. *33–36.) Advertisements for Cingular service gave the impression that coverage was available in all areas at all times, when it was not. (*Id.*, 2004 Cal.P.U.C. Lexis 453 at pp. *44–52.) Cingular's advertisements also provided misleading information regarding Cingular's early termination fees (discussed more fully *post*). (*Ibid.*)

Over time, Cingular changed its policies regarding the imposition of termination fees and the grace periods included in its service contracts. From January 1, 2000 until May 1, 2002, Cingular's one- and two-year service contracts included an early termination fee (ETF). (*Cingular I, supra*, 2004 Cal.P.U.C. Lexis 453 at p. *114.) To cancel service contracts before the expiration date, customers were required to pay Cingular a $150 ETF, and in some cases to pay Cingular's agents an additional ETF of up to $400. (*Id.*, 2004 Cal.P.U.C. Lexis 453 at p. *1.) During this time, Cingular did not provide a grace period during which a customer could cancel a service

contract without incurring the ETF. (*Ibid.*) In May 2002, Cingular modified its ETF to add a formal 15-day grace period. (*Ibid.*) In December 2004, as required by a general order of the Commission, Cingular extended the grace period to 30 days. (*Id.*, 2004 Cal.P.U.C. Lexis 453 at p. *108.)[2] Cingular claims its customers could avoid the ETF altogether during any time period either by opting for a no-contract option or by purchasing prepaid services. However, Cingular first made this argument after the close of the evidentiary record, during oral argument before the Commission; the appellate record provides no evidentiary support for this argument. (*Cingular I, supra,* 2004 Cal.P.U.C. Lexis 453 at p. *115.)

Both Cingular's vice-president of marketing for the western region and its vice-president of external affairs testified the best way for customers to determine whether Cingular's service would work for them is to try out the phone for a period of time. But a tryout period for a customer was effectively impossible without the customer incurring a penalty until May 1, 2002, because Cingular and/or its agents charged an ETF from the initial activation date. (*Cingular I, supra,* 2004 Cal.P.U.C. Lexis 453 at p. *121.) Although Cingular provided evidence that it waived the ETF for customers who complained they did not receive the service they expected and had little phone usage, Cingular admitted (1) its independent agents might not have waived their separate ETF's; (2) not all customers were made aware that Cingular would waive the ETF under certain circumstances; and (3) there was no way to know how many customers did not try to terminate their service because they were aware of the ETF. (*Id.*, 2004 Cal.P.U.C. Lexis 453 at p. *123.)

PROCEDURAL HISTORY

On September 28, 2001, the Commission's Consumer Protection and Safety Division (CPSD) sent Cingular a cease-and-desist letter. The letter directed Cingular to immediately stop the practices of misleading consumers as to the availability of service and failing to disclose the existence of the ETF.

---

[2] On May 27, 2004, the Commission adopted general order No. 168. (Cal.P.U.C. Interim Decision Issuing General Order 168, Rules Governing Telecommunications Consumer Protection (May 27, 2004) Dec. No. 04-05-057 [2004 Cal.P.U.C. Lexis 240].) Rule 3(f) of general order No. 168 provides: "Subscribers may cancel without termination fees or penalties any new tariffed service or any new contract for service within 30 days after the new service is initiated." (Cal.P.U.C. Dec. No. 04-05-057, *supra,* 2004 Cal.P.U.C. Lexis 240 at p. *267.) In March 2006, the Commission revised general order No. 168, which no longer mandates a particular grace period for early termination fees. Cingular, however, has continued to permit its customers a 30-day grace period. The change in the Commission's order has no impact on our decision.

On June 6, 2002, the Commission filed an order instituting investigation (OII) into whether Cingular violated sections 451, 702, and 2896 by failing to provide just and reasonable service, by marketing its products in an unjust and unreasonable manner, or by failing to provide customers with sufficient information on which to make informed choices regarding wireless phone services. The OII's summary reads, in relevant part: "Cingular sells mobile telephones bundled with wireless and long-distance telephone services. In so doing, Cingular makes the implied promise that adequate system coverage and capacity will exist in the subscriber's area of use. This promise is then taken back—in some of Cingular's marketing materials—by a fine-print disclaimer of warranty. The limitations of Cingular's system often defeat the customer's reasonable expectations of coverage and capacity. The customer, however, may be prevented from canceling Cingular's service and returning the phones by virtue of a $150 (or higher) early termination fee (ETF) and other fees which make cancellation more costly than continuing to use the inadequate service. The Commission will investigate whether Cingular's sale of cellular telephone service and equipment, and its collection of the ETF and other penalties from consumers, violate the laws of this State or the orders and regulations of this Commission."

The OII specifies that among other remedies, the Commission would consider: (1) whether Cingular "should be ordered to pay reparations pursuant to [Public Utilities] Code § 734, i.e., refund the [ETF], plus interest, to all customers who paid such fee upon terminating their service after discovering that the service was inadequate"; and (2) whether Cingular "should be fined pursuant to [Public Utilities] Code §§ 2107 and 2108 for the above-described violations of the Public Utilit[ies] Code and related Orders, Decisions, Rules, directions, demands and requirements of the Commission." On July 3, 2002, UCAN moved to intervene in the proceedings. At the prehearing conference, the administrative law judge (ALJ) assigned to the proceeding granted the motion to intervene.

A nine-day evidentiary, adjudicatory hearing was conducted in April 2003.[3] On September 9, 2003, the ALJ, acting as the presiding officer, issued a decision ordering Cingular to pay penalties and reparations for violating sections 451, 702, and 2896, and the Commission's decision No. 95-04-028 (*Re Regulation of Cellular Radiotelephone Utilities* (1995) 59 Cal.P.U.C.2d 192). The total penalty assessed against Cingular was $12,140,000; Cingular was also ordered to reimburse customers who had paid all or part of an ETF between January 1, 2000 and April 30, 2002. Cingular appealed the ALJ's decision to the Commission.

---

[3] The 12-month deadline on adjudication of cases (§ 1701.2, subd. (d)) was extended by an order dated December 17, 2002.

On September 29, 2004, the Commission issued its decision in *Cingular I*, substantially adopting the ALJ's decision. The Commission found Cingular had committed two violations of law: (1) from January 1, 2000 to April 30, 2002, "Cingular's official no return/no refund/ETF policy constituted an unfair rule resulting in a corporate pattern and practice that failed to provide adequate, just, and reasonable service to customers, in violation of § 451 and [decision No.] 95-04-028"; and (2) in 2001, Cingular's failure to disclose to its customers known network problems "resulted in a failure to provide adequate, just, and reasonable service, in violation of §[§] 451, 702, [and] 2896 and [decision No.] 95-04-028." (*Cingular I, supra*, 2004 Cal.P.U.C. Lexis 453 at p. *125.) The Commission imposed a penalty of $10,000 per day for the first violation of law, for a total penalty of $8.49 million, and a penalty of $10,000 per day for the second violation of law, for a total penalty of $3.65 million. (*Id.*, 2004 Cal.P.U.C. Lexis 453 at pp. *125–126.) The Commission also ordered Cingular to reimburse the ETF's charged to its customers between January 1, 2000 and April 30, 2002, and to reimburse the ETF's charged after April 30, 2002, during the first 15 days of the service contract. (*Id.*, 2004 Cal.P.U.C. Lexis 453 at p. *126.)

On October 29, 2004, Cingular applied to the Commission for rehearing. On December 16, 2004, the Commission issued decision No. 04-12-058, in which it denied the request for rehearing in most substantial respects. (Cal.P.U.C. Order Modifying and Denying Rehearing of Decision (D.) 04-09-062 (Dec. 16, 2004) Dec. No. 04-12-058 [2004 Cal.P.U.C. Lexis 577].)[4]

DISCUSSION

I.

PRINCIPLES OF APPELLATE REVIEW OF THE COMMISSION'S DECISIONS.

"[A]ny aggrieved party [to a decision of the Commission] may petition for a writ of review in the court of appeal . . . ." (§ 1756, subd. (a).) As here, when "writ review is the exclusive means of appellate review of a final order or judgment, an appellate court may not deny an apparently meritorious writ petition, timely presented in a formally and procedurally sufficient manner, merely because, for example, the petition presents no important issue of law

---

[4] Cingular filed a petition for modification of the Commission's decision, raising certain policy arguments that it claims might eliminate the need to pursue the present matter. The certified record filed by the Commission does not tell us whether the Commission ever ruled on the modification petition.

or because the court considers the case less worthy of its attention than other matters." (*Powers v. City of Richmond* (1995) 10 Cal.4th 85, 114 [40 Cal.Rptr.2d 839, 893 P.2d 1160], fn. omitted.) We are not, however, "compelled to issue the writ if the [Commission] did not err . . . ." (*Pacific Bell v. Public Utilities Com.* (2000) 79 Cal.App.4th 269, 282 [93 Cal.Rptr.2d 910], fn. omitted.)

In reviewing the Commission's decisions, our standard of review is contained in section 1757, subdivisions (a) and (b): "(a) No new or additional evidence shall be introduced upon review by the court. In a complaint or enforcement proceeding, or in a ratemaking or licensing decision of specific application that is addressed to particular parties, the review by the court shall not extend further than to determine, on the basis of the entire record which shall be certified by the commission, whether any of the following occurred: [¶] (1) The commission acted without, or in excess of, its powers or jurisdiction. [¶] . . . [¶] (6) The order or decision of the commission violates any right of the petitioner under the Constitution of the United States or the California Constitution. [¶] (b) Nothing in this section shall be construed to permit the court to hold a trial de novo, to take evidence other than as specified by the California Rules of Court, or to exercise its independent judgment on the evidence."[5] (At oral argument on appeal, counsel for Cingular argued the Commission's decisions were not supported by the findings. (§ 1757, subd. (a)(3).) That argument was not raised in Cingular's petition, and we will not address it.)

Generally, we give presumptive value to a public agency's interpretation of a statute within its administrative jurisdiction because the agency may have "special familiarity with satellite legal and regulatory issues," leading to expertise expressed in its interpretation of the statute. (*Yamaha Corp. of America v. State Bd. of Equalization* (1998) 19 Cal.4th 1, 11 [78 Cal.Rptr.2d 1, 960 P.2d 1031].) Therefore, "the PUC's 'interpretation of the Public Utilities Code should not be disturbed unless it fails to bear a reasonable relation to statutory purposes and language . . . .' [Citation.] However, 'the general rule of deference to interpretations of statutes subject to the regulatory jurisdiction of agencies does not apply when the issue is the scope of the agency's jurisdiction.' [Citation.] Even in cases not questioning the jurisdiction of an agency, the interpretation of statutes is a question of law subject to independent judicial review. [Citation.]" (*PG&E Corp. v. Public Utilities Com., supra,* 118 Cal.App.4th 1174, 1194–1195, fn. omitted.)

---

[5] We invited the parties to submit letter briefs on the issue whether section 1757 or section 1757.1 provided the applicable standard of review in this case. Based on the parties' submissions, we conclude this is a "complaint or enforcement proceeding," making section 1757 applicable. (See § 1702; *PG&E Corp. v. Public Utilities Com.* (2004) 118 Cal.App.4th 1174, 1194 [13 Cal.Rptr.3d 630].)

So, applying these legal principles, these are the questions to be resolved and our answers to them:

1. Were the Commission's decisions directly or impliedly preempted by federal law? No.

2. Does the Commission have jurisdiction to impose fines on public utilities under section 2107? Yes.

3. Can the Commission impose a penalty on a public utility for nondisclosure under section 2896, subdivision (a)? Yes.

4. Did the imposition of a fine under the circumstances of this case violate Cingular's due process rights? No.

5. Is the existing reparations order overbroad? No.

We address each of these issues fully in turn.

## II.

### THE COMMISSION'S DECISIONS ARE NOT PREEMPTED BY TITLE 47 UNITED STATES CODE SECTION 332(c)(3)(A).

Cingular argues the Commission's decisions are preempted by federal law. The party claiming federal preemption bears the burden of establishing it. (*Washington Mutual Bank v. Superior Court* (2002) 95 Cal.App.4th 606, 613 [115 Cal.Rptr.2d 765].)

The Federal Communications Act of 1934, as amended by the Omnibus Budget Reconciliation Act of 1993, provides, "no State or local government shall have any authority to regulate the entry of or the rates charged by any commercial mobile service or any private mobile service, except that this paragraph shall not prohibit a State from regulating the other terms and conditions of commercial mobile services." (47 U.S.C. § 332(c)(3)(A).) Cingular claims the Commission's order that Cingular refund the ETF's to its customers constitutes a regulation of rates. Cingular also argues the Commission imposed service quality and network performance standards, thus impermissibly regulating the entry of mobile services into the market and regulating rates. Three significant cases bear on our determination whether the Commission's decisions are preempted.

In *Bastien v. AT&T Wireless Services, Inc.* (7th Cir. 2000) 205 F.3d 983, 985, which Cingular contends is directly on point, the plaintiff alleged AT&T Wireless signed up wireless telephone subscribers without first building the cellular towers and other infrastructure necessary to provide reliable cellular connections; as a result, many attempts to place calls on AT&T Wireless's system were unsuccessful. The plaintiff also alleged AT&T Wireless nevertheless continued marketing its telephones and services; in so doing, AT&T Wireless violated its contracts, the implied duty of good faith and fair dealing, and the Illinois Consumer Fraud Act. (*Ibid.*) The court concluded the plaintiff's complaint "would directly alter the federal regulation of tower construction, location and coverage, quality of service and hence rates for service." (*Id.* at p. 989.) "These claims tread directly on the very areas reserved to the FCC [Federal Communications Commission]: the modes and conditions under which AT&T Wireless may begin offering service in the Chicago market. The statute makes the FCC responsible for determining the number, placement and operation of the cellular towers and other infrastructure, as well as the rates and conditions that can be offered for the new service. Should the state court vindicate [the plaintiff]'s claim, the relief granted would necessarily force AT&T Wireless to do more than required by the FCC: to provide more towers, clearer signals or lower rates. The statute specifically insulates these FCC decisions from state court review." (*Ibid.*) The Seventh Circuit Court of Appeals concluded the plaintiff's claim was preempted by 47 United States Code section 332(c)(3)(A). (*Bastien v. AT&T Wireless Services, Inc., supra*, at p. 984.)

In contrast, the relief granted by the Commission in this case does not require Cingular to provide any particular infrastructure or charge any particular rate. It requires Cingular to provide full and fair disclosure of its service, and prohibits misrepresentations regarding service. The court in *Bastien v. AT&T Wireless Services, Inc.* noted the "complete absence of any details in the pleading regarding the particular promises or representations made by AT&T Wireless." (*Bastien v. AT&T Wireless Services, Inc., supra*, 205 F.3d at pp. 989–990.) The same cannot be said about the Commission's decisions here, which detail the representations made by Cingular and why those representations were false or misleading.

In *In re Wireless Consumers Alliance, Inc.* (2000) 15 F.C.C.R. 17,021, paragraph 2, the Federal Communications Commission (FCC) concluded that 47 United States Code section 332(c)(3)(A) "does not generally preempt the award of monetary damages by state courts based on state consumer protection, tort, or contract claims. We note, however, that whether a specific damage calculation is prohibited by Section 332 will depend on the specific details of the award and the facts and circumstances of a particular case."

Billing information, practices, and disputes all fall within the "other terms and conditions" clause of 47 United States Code section 332(c)(3)(A) and can be regulated by the Commission. (*In re Wireless Consumers Alliance, Inc., supra*, at ¶ 14.) "We find there are several arguments which support our decision that awarding monetary damages is not necessarily equivalent to rate regulation. First, we agree with commenters that there is no necessary correspondence between the indirect effect that monetary liability may have on a company's behavior and the direct effect that a statute or regulatory rate requirement will have on that behavior. For example, if a company is found monetarily liable for false advertising, it will presumably alter its advertising. The impact on its prices and other behavior, however, is uncertain. The indirect and uncertain effects of monetary damage awards based on tort and contract law do not correspond to the mandatory corporate actions that are required as a result of legislative or administrative rate regulation activities." (*Id.* at ¶ 23, fns. omitted.)

The FCC rejected the argument that "any determination of monetary liability is equivalent to a finding that the service was inadequate for the price charged and therefore necessarily constitutes a finding that the rates originally charged were unreasonable." (*In re Wireless Consumers Alliance, Inc., supra*, 15 F.C.C.R. at ¶ 25.) The FCC also rejected the argument "that non-disclosure and consumer fraud claims are in fact disguised attacks on the reasonableness of the rate charged for the service. A carrier may charge whatever price it wishes and provide the level of service it wishes, as long as it does not misrepresent either the price or the quality of service. Conversely, a carrier that is charging a 'reasonable rate' for its services may still be subject to damages for a non-disclosure or false advertising claim under applicable state law if it misrepresents what those rates are or how they will apply, or if it fails to inform consumers of other material terms, conditions, or limitations on the service it is providing. We thus do not agree with those commenters who allege that, for consumer protection claims, any damage award or damage calculation, including any refund or rebate, is necessarily a ruling on the reasonableness of the price or the functional equivalent of a retroactive rate adjustment." (*Id.* at ¶ 27, fns. omitted.)

The FCC concluded that the incidental effect on prices resulting from imposition of a damage award did not constitute regulation of rates, citing *Nader v. Allegheny Airlines* (1976) 426 U.S. 290, 300 [48 L.Ed.2d 643, 96 S.Ct. 1978]. (*In the Matter of Wireless Consumers Alliance, Inc., supra*, 15 F.C.C.R. at ¶ 33; see also *Cellular Telecommunications Industry v. FCC* (1999) 335 U.S. App. D.C. 32 [168 F.3d 1332, 1336].) The FCC noted that a

court would overstep its authority in determining damages under 47 United States Code section 332(c)(3)(A) if it "purports to determine the reasonableness of a prior rate or it sets a prospective charge for services." (*In re Wireless Consumers Alliance, Inc., supra,* at ¶ 39.)

Finally, the FCC distinguished *Bastien v. AT&T Wireless Services, Inc., supra,* 205 F.3d 983, which had been decided five months earlier. The FCC concluded the court in *Bastien* had not decided the question whether an award of monetary damages is equivalent to impermissible ratemaking under 47 United States Code section 332(c)(3)(A), and stood only for the general propositions that state law claims may or may not be preempted by 47 United States Code section 332(c)(3)(A) and that it is the substance, not the form, of the claim that determines whether it is preempted. (*In re Wireless Consumers Alliance, Inc., supra,* 15 F.C.C.R. at ¶ 28.)

In *Spielholz v. Superior Court* (2001) 86 Cal.App.4th 1366, 1368–1369 [104 Cal.Rptr.2d 197], the petitioner sued her wireless telephone provider for false advertising, alleging that the wireless company advertised a " 'seamless calling area' " throughout Southern California, but failed to disclose gaps or " 'dead zones' " where users were unable to connect calls. The trial court struck all allegations for monetary relief, concluding "that for the court to award damages or restitution based on false advertising it must determine the value of the services provided, and that that determination would constitute rate regulation within the meaning of [47 United States Code] section 332(c)(3)(A) and therefore is expressly preempted." (*Id.* at p. 1369.) The Court of Appeal stayed the proceedings on the petition for writ of mandate pending the FCC's declaratory ruling in *In the Matter of Wireless Consumers Alliance, Inc., supra,* 15 F.C.C.R. 17,021 (*Spielholz v. Superior Court, supra,* 86 Cal.App.4th at p. 1370.)

The *Spielholz* court summarized the law on preemption under 47 United States Code section 332(c)(3)(A) following *In re Wireless Consumers Alliance, Inc., supra,* 15 F.C.C.R. 17,021: "A judicial act constitutes rate regulation only if its principal purpose and direct effect are to control rates. For example, an injunction that prevents a wireless telephone service provider from charging specified rates would directly regulate rates. [Citations.] Similarly, if a cause of action directly challenges a rate as unreasonable, an award of damages or restitution to compensate a customer for the difference between the rate paid and what the court determines to be a reasonable rate would directly regulate rates. [Citations.] In general, a claim that directly challenges a rate and seeks a remedy to limit or control the rate prospectively

or retrospectively is an attempt to regulate rates and therefore is preempted under [47 United States Code] section 332(c)(3)(A); a claim that directly challenges some other activity, such as false advertising, and requires a determination of the value of services provided in order to award monetary relief is not rate regulation." (*Spielholz v. Superior Court, supra,* 86 Cal.App.4th at pp. 1374–1375.)

The *Spielholz* court then concluded, "a claim that does not directly challenge the rate but directly challenges some other activity, such as false advertising, and seeks a remedy to limit or control that activity or seeks damages arising from the activity is not an attempt to regulate rates and is not expressly preempted under [47 United States Code] section 332(c)(3)(A). If the principal purpose and direct effect of a remedy are to prevent false advertising and compensate an aggrieved customer, any prospective or retrospective effect on rates is merely incidental. This is true even if the court determines the value of services provided in awarding damages or restitution. [Citation.] Contrary to AT&T's argument, an award of damages or restitution for false advertising that requires the court to determine the value of services provided is not rate regulation. [Citation.]" (*Spielholz v. Superior Court, supra,* 86 Cal.App.4th at pp. 1375–1376.) The court disagreed with the holding in *Bastien v. AT&T Wireless Services, Inc., supra,* 205 F.3d 983, that a challenge to service quality necessarily attacks the reasonableness of rates approved by the FCC. (*Spielholz v. Superior Court, supra,* at p. 1380.)

■ We conclude the Commission's decisions in this case were not preempted by 47 United States Code section 332(c)(3)(A). The Commission's decisions do not directly challenge Cingular's rates, nor do they require Cingular to make any specific changes to its infrastructure. As in *Spielholz v. Superior Court,* the Commission's challenge to the ETF and to Cingular's policy of permitting no grace period, combined with the misrepresentations regarding service, is not a preempted regulation of rates or of market entry. The principal purpose and direct effect of the penalties imposed by the Commission are to prevent misrepresentations by Cingular and to compensate the wireless customers who paid ETF's. The effect of these penalties on Cingular's rates is incidental, and the Commission's decisions are therefore not preempted by 47 United States Code section 332(c)(3)(A).[6]

---

[6] In *Cellco Partnership v. Hatch* (8th Cir. 2005) 431 F.3d 1077, the Eighth Circuit Court of Appeals analyzed a Minnesota statute prohibiting wireless providers from making any changes in the terms and conditions of their contracts with subscribers "that 'could result' in increased rates or an extended contract term, unless they first obtain affirmative written or oral consent from the subscriber. [Citations.]" (*Id.* at p. 1079.) The Eighth Circuit concluded this statute constituted rate regulation and was therefore preempted by 47 United States Code section 332(c)(3)(A) because "[t]he requirement . . . that consumers consent to any substantive change

■  Cingular also argues the Commission's decisions are impliedly preempted because they are "an obstacle to the accomplishment and execution of the full purposes and objectives of Congress" (*Hines v. Davidowitz* (1941) 312 U.S. 52, 67 [85 L.Ed. 581, 61 S.Ct. 399]).[7] In *Spielholz v. Superior Court, supra,* 86 Cal.App.4th at pages 1376–1377, the appellate court concluded the availability of state law remedies for false advertising was consistent with Congress's "objective to achieve maximum benefits for [wireless] consumers," citing *In re Wireless Consumers Alliance, Inc., supra,* 15 F.C.C.R. 17,021, paragraphs 22 and 24. Here, too, the penalties and disgorgement ordered by the Commission were consistent with Congress's intent to maximize benefits to consumers. We conclude the doctrine of implied preemption is inapplicable in this case.

### III.

#### THE COMMISSION HAS JURISDICTION UNDER SECTION 2107 TO IMPOSE PENALTIES ON PUBLIC UTILITIES.

Cingular argues the Commission lacks jurisdiction to impose a penalty and was required to commence the action in the superior court, pursuant to sections 2107 and 2104.[8]

---

prevents providers from raising rates for a period of time, and thus fixes the rates." (*Cellco Partnership v. Hatch, supra,* 431 F.3d at p. 1082.) *Cellco Partnership v. Hatch* is not on point with the present case.

[7] Implied preemption may be established where a federal law demonstrates an intent to " 'occupy the field' " or where a state law conflicts with a federal law. (*Crosby v. National Foreign Trade Council* (2000) 530 U.S. 363, 372 [147 L.Ed.2d 352, 120 S.Ct. 2288]; see *Spielholz v. Superior Court, supra,* 86 Cal.App.4th at p. 1371.) Conflict between state and federal laws exists when compliance with both the state and the federal law is impossible, or where the state law is an obstacle to congressional goals and purposes. (*Crosby v. National Foreign Trade Council, supra,* at pp. 372–373; see *Spielholz v. Superior Court, supra,* at p. 1371.) Cingular's argument on implied preemption is limited to a conflict between state and federal law as an obstacle to the fulfillment of congressional goals and objectives. We therefore do not address the other aspects of implied preemption in this opinion.

[8] Section 2107 provides: "Any public utility which violates or fails to comply with any provision of the Constitution of this state or of this part, or which fails or neglects to comply with any part or provision of any order, decision, decree, rule, direction, demand, or requirement of the commission, in a case in which a penalty has not otherwise been provided, is subject to a penalty of not less than five hundred dollars ($500), nor more than twenty thousand dollars ($20,000) for each offense."

Section 2104 provides: "Except as provided by Sections 2100 and 2107.5, actions to recover penalties under this part shall be brought in the name of the people of the State of California, in the superior court in and for the county, or city and county, in which the cause or some part thereof arose, or in which the corporation complained of has its principal place of business, or in which the person complained of resides. The action shall be commenced and prosecuted to final judgment by the attorney of the commission. In any action, all penalties incurred up to the time of commencing the action may be sued for and recovered. In all of these actions, the

■ No published California case has addressed this issue. The courts of this state have held that the powers of the Commission within its province are broad. As our Supreme Court has explained: "The commission is a state agency of constitutional origin with far-reaching duties, functions and powers. [Citation.] The Constitution confers broad authority on the commission to regulate utilities, including the power to fix rates, establish rules, hold various types of hearings, award reparation, and establish its own procedures. [Citation.] The commission's powers, however, are not restricted to those expressly mentioned in the Constitution: 'The Legislature has plenary power, unlimited by the other provisions of this constitution but consistent with this article [art. XII], to confer additional authority and jurisdiction upon the commission . . . .' [Citation.] [¶] Pursuant to this grant of power the Legislature enacted Public Utilities Code section 701, conferring on the commission expansive authority to '*do all things*, whether specifically designated in [the Public Utilities Act] *or addition thereto*, which are necessary and convenient' in the supervision and regulation of every public utility in California. . . . The commission's authority has been liberally construed. [Citations.] Additional powers and jurisdiction that the commission exercises, however, 'must be cognate and germane to the regulation of public utilities . . . .' [Citations.]" (*Consumers Lobby Against Monopolies v. Public Utilities Com.* (1979) 25 Cal.3d 891, 905–906 [160 Cal.Rptr. 124, 603 P.2d 41].)

■ The Commission itself has consistently determined that it has the authority to directly impose fines on public utilities, and that it is required to commence an action in superior court only to collect unpaid fines. (See Cal.P.U.C. Order Denying Rehearing of Decision 99-11-044 (Mar. 2, 2000) Dec. No. 00-03-023 [2004 Cal.P.U.C. Lexis 127, *6–7]; *Re Communications TeleSystems International* (1997) 76 Cal.P.U.C.2d 214, 219–220, 224, fn. 7; *Toward Utility Rate Normalization (TURN) v. Pacific Bell* (1994) 54 Cal.P.U.C.2d 122, 124.) ■ The Commission's interpretation of its own statutory authority " 'should not be disturbed unless it fails to bear a reasonable relation to statutory purposes and language . . . .' [Citation.]" (*PG&E Corp. v. Public Utilities Com., supra,* 118 Cal.App.4th at p. 1194.)

The legislative histories of sections 2107 and 2104 support the Commission's interpretation of its authority to directly impose penalties on the public

procedure and rules of evidence shall be the same as in ordinary civil actions, except as otherwise herein provided. All fines and penalties recovered by the state in any action, together with the costs thereof, shall be paid into the State Treasury to the credit of the General Fund. Any action may be compromised or discontinued on application of the commission upon the terms the court approves and orders."

utilities within its jurisdiction. When section 2107 was amended in 1993 to increase the maximum level of fines, the report of the Assembly Committee on Utilities and Commerce included the following comments: "1) The California Public Utilities Commission [CPUC] is responsible for regulating the rates and services of public utilities and related businesses . . . . [¶] 2) The CPUC has broad authority to levy appropriate fines in the course of its business (PU Code Section 701). That broad authority is supplemented by additional specific fine authority of up to $2000 for each violation or compliance failure by any public utility, corporation, or person with CPUC regulations and orders. [¶] 3) This bill raises the maximum fine from $2000 to $20,000. The CPUC must go to the Superior Court to collect any fines which are levied. Such fines are paid into the General Fund." (Assem. Com. on Utilities and Commerce, Rep. on Sen. Bill No. 485 (1993–1994 Reg. Sess.) June 14, 1993.) Quite clearly, the Legislature believed the Commission had the authority to levy fines, but not the authority to collect those fines without court intervention if they were not paid voluntarily.

When section 2104 was amended later the same year, specifically to encourage greater compliance with the Commission by cellular telephone companies, the analysis of the Assembly committee included the following comments: "The CPUC already has broad authority to levy fines and penalties on public utilities. Specifically, section 2107 of the Public Utilities Code provides for fines of up to $2000 for each violation of any provision of any order, decision, rule, or requirement of the CPUC." (Assem. Com. on Utilities and Commerce, Analysis of Sen. Bill No. 598 (1993–1994 Reg. Sess.) July 12, 1993.)

■ We believe the Commission's interpretation of sections 2107 and 2104, giving it authority to directly impose fines on public utilities, is the correct one. An action to recover penalties under section 2107 presupposes a penalty has been levied or imposed. The only reasonable interpretation of the statute is that it requires the Commission to go to court to collect the fines it has imposed if those fines are not paid voluntarily. Requiring the Commission to commence an action in superior court every time it believed a fine against a public utility might be warranted is inconsistent with the statutes and would impose undue burdens on the Commission and the judicial system. (Cal.P.U.C. Dec. No. 00-03-023, *supra*, 2000 Cal.P.U.C. Lexis 127 at pp. *8–9.) Therefore, we conclude the Commission had jurisdiction to impose a penalty on Cingular.

## IV.

THE COMMISSION DID NOT ERR BY RELYING, IN PART, ON SECTION
2896 TO PUNISH CINGULAR FOR ITS NONDISCLOSURES AND
MISLEADING STATEMENTS.

Cingular contends section 2896 cannot serve as the basis for the nondisclosure penalty because (1) Cingular is being punished for failing to disclose what its customers already knew, namely, that cell phones do not work everywhere and that wireless networks cannot always connect calls; (2) Cingular should not have been selectively punished under a statute applicable to all telecommunications companies; and (3) section 2896 alone cannot be the basis for imposition of a penalty.

Section 2896, subdivision (a), provides: "The commission shall require telephone corporations to provide customer service to telecommunication customers that includes, but is not limited to, all the following: [¶] (a) Sufficient information upon which to make informed choices among telecommunications services and providers. This includes, but is not limited to, information regarding the provider's identity, service options, pricing, and terms and conditions of service. A provider need only provide information to its customers on the services which it offers."

In *Cingular I*, the Commission concluded: "Were Cingular's disclosure practices a violation of law? Weighing evidence on the recognized imperfections in wireless systems generally against evidence of the scope of Cingular's known network problems in 2001, including its inability to meet its own internal measurement standards at times, we find that Cingular's coverage disclosures were insufficient to permit customers to make informed choices about whether to contract for its services. This failure does not meet the just and reasonable service mandate of § 451, and cannot meet an objective interpretation of the duty owed to customers under § 2896[, subdivision] (a)." (*Cingular I, supra*, 2004 Cal.P.U.C. Lexis 453 at p. *85, fn. omitted.)

The Commission's decisions address a failure to provide information of far greater significance than that cell phones do not work everywhere and that all calls are not connected on the first try. Cingular provided prospective customers with rate area maps, not coverage maps, and its agents provided customers with misleading information regarding coverage. (*Cingular I, supra*, 2004 Cal.P.U.C. Lexis 453 at pp. *84–85.) The public's general knowledge about the limitations of wireless telephone service cannot make up for Cingular's misleading information, about which the record contains substantial supporting evidence. And, contrary to Cingular's assumption that the limitations of wireless telephone service are well known to cell phone

users, Robert Zicker, the telecommunications expert for CPSD and UCAN, testified: "I participated in a number of focus groups and in those focus groups the people that I monitored and spoke with expected their wireless phone to work wherever they were, whenever they wanted it to. That is their expectation. It may be unrealistic to you, but to them it wasn't. So I believe it is what the public is believing should and could be available to them."

■   Cingular also argues, "[i]mposing a special disclosure obligation upon Cingular and only Cingular for unspecified 'network problems' that may or may not be any different than those of any other provider cannot possibly provide a consumer with useful knowledge so as to distinguish Cingular's services from anyone else's." This argument is easily resolved. Whether other wireless companies suffered from the same network problems as Cingular in 2001 does not negate Cingular's obligation to provide accurate, meaningful information to its customers and potential customers. Had Cingular informed its customers and potential customers about its network problems, those customers and potential customers might have chosen to obtain wireless service from another provider, or might have chosen not to obtain any service at all. But that is pure speculation. The Commission has discretion to establish enforcement priorities. (See generally *People v. Cimarusti* (1978) 81 Cal.App.3d 314, 323 [146 Cal.Rptr. 421].) Pursuing an investigation and imposing penalties against one company but not others for the same act are not constitutional violations unless it can be shown the investigating agency purposefully and intentionally singled out the one company for disparate treatment on an invidiously discriminatory basis. (*Murgia v. Municipal Court* (1975) 15 Cal.3d 286, 297 [124 Cal.Rptr. 204, 540 P.2d 44]; *In re Ratti* (1978) 1 Cal.P.U.C.2d 2, 34–35.) That has not been shown here.

We need not address Cingular's argument that section 2896 alone cannot be the basis for the imposition of a penalty, because the Commission imposed the penalties it did based on Cingular's violation of section 451 as well as section 2896.

Cingular's argument that imposition of a penalty under section 2896 violated due process is subsumed in the discussion, *post.*

## V.

### The Commission's decisions do not violate Cingular's constitutional right to due process.

Cingular contends it was denied due process because it was punished for actions it could not have known were unjust and unreasonable. Cingular argues the statutes and the Commission order it is charged with violating are

so broad that Cingular could not anticipate that its actions were unjust and unreasonable. In analyzing Cingular's argument, we must focus on its conduct of charging and permitting its agents to charge an ETF with no grace period; failing to disclose known, significant network problems; and providing misleading and inaccurate information regarding its coverage and service to its customers. We conclude that given this conduct, Cingular could be charged with knowledge that its actions were unjust and unreasonable under the relevant statutes and the Commission order. Even in the absence of a specific statute, rule, or order barring the imposition of an ETF without a grace period, or barring the specific nondisclosures identified by the Commission in this case, Cingular can be charged with knowing its actions violated section 451's requirement that it provide "adequate, efficient, just, and reasonable service" to its customers.

To accept Cingular's argument would require us to conclude that it is just and reasonable for a wireless provider to charge its customers an ETF to cancel a wireless service contract immediately after activation of the wireless telephone, when the customer has been misled as to the coverage area and level of service, and when the wireless provider admits the best way for the customer to determine whether the service is adequate for his or her needs is to try out the phone for a period of time. This conclusion would be unreasonable.

■ Fair notice is an essential requirement of any statutory scheme. "It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined. Vague laws offend several important values. First, because we assume that man is free to steer between lawful and unlawful conduct, we insist that laws give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly. Vague laws may trap the innocent by not providing fair warning." (*Grayned v. City of Rockford* (1972) 408 U.S. 104, 108 [33 L.Ed.2d 222, 92 S.Ct. 2294], fn. omitted.) Cingular contends it was not on notice that its ETF policy was unjust or unreasonable, or its network service performance required disclosure to its customers and potential customers, or that its failure to make such disclosures could result in the imposition of significant fines by the Commission.

The statutes and the Commission order that Cingular was found to have violated are broadly written.[9] The Commission's interpretation of the reach of sections 451, 702, and 2896, as well as of its own earlier order, must be given

---

[9] "Every public utility shall furnish and maintain such adequate, efficient, just, and reasonable service, instrumentalities, equipment, and facilities, including telephone facilities, as defined in Section 54.1 of the Civil Code, as are necessary to promote the safety, health,

presumptive value. (*Yamaha Corp. of America v. State Bd. of Equalization, supra,* 19 Cal.4th at p. 11.)[10]

If no statute or order of the Commission specifically prohibits the conduct for which Cingular was fined, how could it have notice that this conduct would violate section 451? First, Cingular could reasonably discern from the Commission's interpretations of section 451 that its conduct in this instance would also violate that statute. (See, e.g., *Higginbotham v. Pacific Bell Telephone Company* (2002) Cal.P.U.C. Dec. No. 02-08-069 [substituting less accurate and less convenient means of obtaining local toll pricing information without a compelling reason is unreasonable and violates section 451; case originally filed while Cingular provided misleading information regarding service, and provided no grace period for ETF]; *Office of Ratepayer Advocates v. Pacific Bell Telephone Company* (2001) Cal.P.U.C. Dec. No. 01-12-021 [two violations of section 451—significant increase in average time to restore dial tone service, and failure to notify customers of the availability of a four-hour appointment window when calling 611 repair service; case filed in 2000]; *Utility Consumers' Action Network v. Pacific Bell*

---

comfort, and convenience of its patrons, employees, and the public. [¶] All rules made by a public utility affecting or pertaining to its charges or service to the public shall be just and reasonable." (§ 451.)

"Every public utility shall obey and comply with every order, decision, direction, or rule made or prescribed by the commission in the matters specified in this part, or any other matter in any way relating to or affecting its business as a public utility, and shall do everything necessary or proper to secure compliance therewith by all of its officers, agents, and employees." (§ 702.)

"The commission shall require telephone corporations to provide customer service to telecommunication customers that includes, but is not limited to, all the following: [¶] (a) Sufficient information upon which to make informed choices among telecommunications services and providers. This includes, but is not limited to, information regarding the provider's identity, service options, pricing, and terms and conditions of service. A provider need only provide information to its customers on the services which it offers." (§ 2896, subd. (a).)

"[A] provider of cellular telephone service may provide or permit any agent or dealer or other person or entity subject to its control to provide to any customer or potential customer equipment price concessions offered on the condition that such customer or potential customer subscribes to the provider's cellular telephone service. However, such activity shall be permissible only to the extent that: [¶] . . . [¶] 5. Providers conform to all applicable California and federal consumer protection and below-cost pricing laws." (*Re Regulation of Cellular Radiotelephone Utilities, supra,* 59 Cal.P.U.C.2d 192, 213–214.)

[10] We agree that section 451 is not void for vagueness on its face. (*Carey v. Pacific Gas and Electric Company* (1999) 85 Cal.P.U.C.2d 682, 689 ["it would be virtually impossible to draft Section 451 to specifically set forth every conceivable service, instrumentality and facility which might be defined as 'reasonable' and necessary to promote the public safety. That the terms are incapable of precise definition given the variety of circumstances likewise does not make Section 451 void for vagueness, either on its face or in application to the instant case. The terms 'reasonable service, instrumentalities, equipment and facilities' are not without a definition, standard or common understanding among utilities"].)

(2001) Cal.P.U.C. Dec. No. 01-09-058 [misleading or potentially misleading marketing tactics violate section 451, particularly sales tactics regarding caller ID plans, inside wire maintenance plans, and marketing service plans by offering them in descending price order without fully disclosing all available options in the plans; case filed in 1998]; *First Financial Network v. Pacific Bell* (1998) 80 Cal.P.U.C.2d 407, 416 [public utility violates section 451 by providing customer with far more than necessary in equipment and service]; *Corona City Council v. Southern California Gas Company* (1992) 45 Cal.P.U.C.2d 301, 313 [public utility violated section 451 by closing branch offices with inadequate notice and without reasonable alternative services available]; Cal.P.U.C. Proposed Decision of *ALJ Meaney* (Apr. 5, 1984) Dec. No. 84-04-041 [employee discount that is part of public utility's tariffs may nevertheless violate section 451 if it is excessive]; *National Communications Center Corp. v. PT&T Co.* (1980) 3 Cal.P.U.C.2d 672 [section 451 requires telephone utility to "provide all available and accurate information as those customers may require to make an intelligent choice between similar services where such a choice exists"]; *Hidden Valley West v. SDG&E Co.* (1977) 81 Cal.P.U.C. 627, 636 [failure to return money paid for estimated projects in excess of actual cost violates section 451].) These cases deal with a variety of different acts and omissions by many types of public utilities. From a reading of these cases (as well as many others not cited here) and their rationale, Cingular was on notice that the Commission would determine Cingular's actions here violated sections 451, 702, and 2896.

The marketplace also informed Cingular the totality of its acts and omissions was not just and reasonable, and it was not providing sufficient information to its customers. The record in this case is replete with complaints from Cingular's customers, including complaints specific to the failure of Cingular's service to perform as promised. Indeed, the record shows the purpose of the imposition of the ETF was to prevent "churn"—having customers cancel their service and obtain service from a competitor. While some churn experienced by Cingular (like that of its competitors) was due to better deals or offers by other wireless providers, the record reflects that some churn was due to the failure of Cingular's wireless service to perform as promised. And while it is undisputed that all wireless providers suffer some system failures and cannot guarantee coverage at all times in all locations, the record shows Cingular's California region was the only major wireless provider in the California market and the only Cingular region to impose an ETF without a grace period.

Finally, we find no appreciable difference between the application of sections 451, 702, and 2896 in this case, and the application of Civil Code sections 1709 and 1710 in what we may refer to as a garden variety fraud

case. The Civil Code does not define what conduct is deceitful, or what types of misrepresentations or omissions are material. Those decisions are left to the trier of fact, based on the facts of the particular case. A defendant can be found to have committed fraud based on misrepresentations or omissions that are not specified in any statute, and can be ordered to pay significant sums in compensatory and punitive damages as a result.

Cingular contends that section 451 can only be used to impose a retroactive fine in conjunction with another more specific source of law.[11] While in most of the cases which the parties have cited on appeal, there was another violation of law, we do not infer from this that there *must* be another statute or rule or order of the Commission that has been violated for the Commission to determine there has been a punishable violation of section 451.[12] In at least one case, *Carey v. Pacific Gas and Electric Company, supra,* 85 Cal.P.U.C.2d 682, 683, the Commission fined the public utility for violating section 451 (without finding a violation of any other specific statute) by failing to " 'furnish and maintain such adequate, efficient, just and reasonable service, instrumentalities, equipment and facilities' " when the utility permitted fumigators to turn off gas service to buildings before tenting them.

Cingular also argues section 728 prohibits imposition of fines on a retroactive basis. Section 728, which requires the Commission to determine just and reasonable rates when it finds that the rates charged were unreasonable, does not apply here. As noted *ante*, this is not a rate-setting case. Even by analogy, section 728 does not apply because while requiring prospective rate-setting action, it does not prohibit retroactive punishment for imposition of unreasonable rates.

---

[11] Cingular relies heavily on the dissenting opinion of Commissioner Kennedy: "[W]e are punishing behavior that was not against any Commission rule at the time. We should be reluctant to impose heavy fines for allegedly bad behavior in the absence of regulations specifically prohibiting that behavior." (*Cingular I, supra,* 2004 Cal.P.U.C. Lexis 453 at pp. *170–171 (dis. opn. of Kennedy, Comr.).) While Commissioner Kennedy did not believe the Commission could or should punish Cingular for its service failures, she agreed that Cingular's policy of imposing an ETF without permitting any grace period violated section 451. (*Cingular I, supra,* 2004 Cal.P.U.C. Lexis 453 at p. *168 (dis. opn. of Kennedy, Comr.).)

[12] In two of the cases cited by the Commission, the utility in question was ordered to pay reparations based only on a violation of section 451. Those cases, however, are so factually distinct that they are of little value in our analysis. In *National Communication Center Corp. v. PT&T Co.* (1979) 2 Cal.P.U.C.2d 533, 534–535, a California corporation sought reparations from the local telephone utility because the utility furnished it with an uneconomical equipment configuration. The Commission held the utility's failure to make line usage meters available to its customer was a failure to provide just and reasonable service and equipment. (*Id.* at pp. 545, 549.) In *First Financial Network v. Pacific Bell, supra,* 80 Cal.P.U.C.2d 407, the telephone utility sold a small company a telephone configuration system that was far more sophisticated and expensive than the company needed. The Commission concluded that the "provision of far excessive equipment and services abused the utility's statutory obligations under PU Code § 451." (*Id.* at p. 416.)

██ Cingular is in essence arguing it had no way of knowing it was neither just nor reasonable to (1) charge an ETF of $150 and permit its agents to charge an additional ETF of up to $400, from the first day after initiating a customer's service, when it admitted the best way for the customer to determine whether Cingular's service would work for him or her was to try the phone out; or (2) fail to disclose to its customers and potential customers that its network was straining under the weight of new customers and increased usage, and incorrectly identify rate area maps as coverage maps. We find no error in the Commission's conclusion that Cingular knew or reasonably should have known those actions on its part were neither just nor reasonable. A company's action can be unjust or unreasonable without a specific rule or statute prohibiting it. As the Commission stated in *Cingular I*, "[n]o utility, whether one operating in a more traditional, tariffed environment, or one operating in a partially deregulated environment, should expect to be insulated from the obligation to treat its customers fairly." (*Cingular I, supra*, 2004 Cal.P.U.C. Lexis 453 at pp. *116–117.) ██ As the United States Supreme Court has held, "[o]bjections to vagueness under the Due Process Clause rest on the lack of notice, and hence may be overcome in any specific case where reasonable persons would know that their conduct is at risk." (*Maynard v. Cartwright* (1988) 486 U.S. 356, 361 [100 L.Ed.2d 372, 108 S.Ct. 1853].)

We also reject Cingular's argument that the Commission did not give it sufficient notice of the possibility a fine would be imposed against it. Cingular raised the same argument before the Commission. The Commission made the following findings and conclusions regarding this argument in *Cingular I*: "Cingular also contends that neither the September, 2001 cease and desist letter nor the June, 2002 OII provide actual notice that Cingular's ETF policy might be held unreasonable for lack of a trial or 'grace period.' We disagree. Both documents clearly constitute notice that the Commission was receiving consumer complaints about Cingular's imposition of an ETF, and that the complaints put at issue the legality of the practice. As Cingular admits, the ETF was imposed without any 'grace period' until May 1, 2002, when Cingular revised its corporate policy to permit a 15-day trial during which service could be cancelled and a phone could be returned without incurring an ETF. Thus until Cingular changed its ETF policy in 2002, Cingular's imposition of an ETF necessarily meant imposition of an ETF without a trial." (*Cingular I, supra*, 2004 Cal.P.U.C. Lexis 453 at p. *117.) We conclude this interpretation of the cease-and-desist letter and the OII is correct.

## VI.

THE REPARATIONS ORDER IS NEITHER OVERBROAD NOR IN CONFLICT
WITH THE FINDINGS OF FACT AND CONCLUSIONS OF LAW.

In addition to the fines imposed, the Commission ordered Cingular to refund the ETF's paid by its customers between January 1, 2000 and April 30, 2002. *Cingular I* includes the following conclusion of law: "In order to avoid unjust enrichment to Cingular and provide reasonable reparation to as many deserving customers as possible, Cingular should be required to reimburse, with interest, those customers who paid Cingular or its agents partial or full ETFs for early cancellations of contracts entered into between January 1, 2000 and April 30, 2002. Cingular also should be required to reimburse, with interest, any customers who paid Cingular or its agents partial or full ETFs after April 30, 2002 for early contract cancellations that occurred between day 1 and day 15 of the contract period. Cingular should prepare and file a refund plan in conformance with today's decision." (*Cingular I, supra*, 2004 Cal.P.U.C. Lexis 453 at p. *126.) The Commission later modified the reparations order to provide, " 'Cingular need not pay reparations to customers for whom the ETF was waived or who have already received ETF refunds from Cingular or its agents.' " (Cal.P.U.C. Order Modifying and Denying Rehearing of Decision (D.) 04-09-062, *supra*, 2004 Cal.P.U.C. Lexis 577 at p. *50.)

Cingular argues that despite the modification, the reparations order is still overbroad in two respects. First, Cingular contends that, during the period from January 1, 2000 through April 30, 2002, it should only have to refund ETF's to those customers who cancelled their contracts within the first 15 days. This argument presupposes that because the reparations period selected by the Commission ended on the day Cingular formally instituted a 15-day grace period, the Commission has permitted Cingular to charge an ETF after the 15th day from initiation of service. The Commission did not make such a finding in this case, however. The Commission actually found "[a] 15-day ETF policy, such as Cingular's present policy, may not provide sufficient time for many consumers to reasonably test a provider's service, particularly considering the lack of information about coverage and capacity available to consumers." (*Cingular I, supra*, 2004 Cal.P.U.C. Lexis 453 at p. *124.)

Additionally, *Cingular I* includes findings that Cingular actively worked to keep customers from terminating their service within the first 15 days after initiating service, even before instituting the formal 15-day grace period.

"Cingular's corporate materials illustrate the importance of its customer retention policy. The 'Ask Jack' program overview states: 'All Customer Care Representatives handle calls from customers who request cancellation of service. It is every representative's responsibility to save customers by aggressively identifying issues and providing solutions, which reduce churn.' . . . Among the save strategies that customer witnesses report are phone exchanges and upgrades tied to execution of a new service contract and assurances about forthcoming infrastructure improvements. Either easily could, and in some reported cases did, keep a customer under contract beyond 15 days." (*Cingular I, supra,* 2004 Cal.P.U.C. Lexis 453 at pp. *60–61.) If Cingular convinced its customers to stay with the service beyond the 15-day mark (and the evidence supports such a finding), then it should not be able to avoid providing refunds to those customers as part of the reparations plan.

Second, Cingular contends it should only be required to refund ETF's to those customers who indicated they were terminating their contracts because of service problems. Cingular contends its records detail the reasons each customer terminated service. However, there is no evidence in the record that Cingular's records accurately and completely reflect the reason why any particular customer terminated service with Cingular.

Therefore, we must reject both of these arguments by Cingular in light of the record as a whole.

In its petition for rehearing, Cingular argues for the first time the Commission only has power to award reparations against a public utility for unreasonable, excessive, or discriminatory rates, and our conclusion that the Commission's orders were not rate regulation and were not preempted by 47 United States Code section 332(c)(3)(A) is thus inconsistent with our affirmance of the reparations order. Arguments cannot be raised for the first time in a petition for rehearing. (*Reynolds v. Bement* (2005) 36 Cal.4th 1075, 1092 [32 Cal.Rptr.3d 483, 116 P.3d 1162].) Even if we were to consider Cingular's argument, we would reject it. Section 734 may apply in any case in which "the commission has found, after investigation, that the public utility has charged an unreasonable, excessive, or discriminatory *amount* therefor in violation of *any of the provisions of this part.*" (Italics added.) The language of the statute is broad, and applies to the entirety of the Public Utilities Act, not only to article 2 relating to rates.

### Disposition

The petition for writ of review is denied. Respondent and real party in interest Utility Consumers' Action Network to recover costs on appeal.

Bedsworth, Acting P. J., and Aronson, J., concurred.

A petition for a rehearing was denied July 10, 2006, and the opinion was modified to read as printed above. Petitioner's petition for review by the Supreme Court was denied October 11, 2006, S145516.